HOME SAVINGS AND LOAN ASSOCIATION OF JOLIET, Plaintiff, *v.* ROY E. SCHNEIDER *et al.*, Defendants (Ernest L. Harrelson *et al.*, Counter-plaintiffs-Appellees, *v.* Richard H. Hataburda *et al.*, Counterdefendants-Appellants).

Third District   No. 3—83—0522

Opinion filed May 31, 1984.—Rehearing denied October 19, 1984.

James C. Murray, Jr., and Beth Byster Corvino, both of Katten, Muchin, Zavis, Pearl & Galler, of Chicago, and James E. Babcock, of Wright & Babcock, of Joliet, for appellants.

Roman R. Okrei, of Stefanich, McGarry & Wols, Ltd., of Joliet, for appellees.

JUSTICE BARRY delivered the opinion of the court:

The suit which is the subject of this appeal was initiated in the circuit court of Will County on December 1, 1981, by Home Savings and Loan Association, mortgagee of property at 725 Geneva Avenue, Romeoville. The financial institution's foreclosure cause of action sought to enforce a due-on-sale provision in its 1972 mortgage agreement against mortgagors, Roy and Sue Schneider, and their successors, Richard and Patricia Hataburda. Also included as party defendants were Ernest and Peggy Harrelson as possessors of the premises. According to the verified complaint, the Hataburdas entered into an agreement in 1976 to assume the Schneiders' liability on their mortgage loan. The Hataburdas then entered into a purchase-sale agreement with the Harrelsons for $47,500 on September 23, 1978, in violation of the due-on-sale terms of the note and mortgage agreement. The amount claimed due in the complaint was $18,170.42.

On December 28, 1981, the Harrelsons answered Home Savings and Loan's complaint and filed a verified cross-complaint in four counts against the Hataburdas for rescission of their purchase contract and for restitution, alleging that they, the Harrelsons, had been induced to enter into the agreement by fraud and negligent misrepre-

sentations of the Hataburdas. (The cross-complaint was later amended to include four additional counts against the Hataburdas.) The Harrelsons contemporaneously filed a motion for the appointment of a receiver to accept their monthly payments under the contract with the Hataburdas pending the outcome of the lawsuit. The Hataburdas then filed a forcible entry and detainer suit against the Harrelsons to recover possession of the real estate at issue. That suit was consolidated with Home Savings and Loan's action and the Harrelsons' cross-complaint on motion of the Harrelsons.

On March 17, 1982, the trial court ordered the Harrelsons to pay their monthly installment payments of $438.97 to Home Savings and Loan, and ordered Home Savings and Loan to apply toward the mortgage an amount representing the Hataburdas' monthly obligation and to place the balance in an escrow account pending resolution of the lawsuit.

On August 27, 1982, on motion of Home Savings and Loan, the court dismissed the financial institution's foreclosure complaint, finding that the plaintiff had accepted payment by the Hataburdas in satisfaction of indebtedness due on the mortgage. Finally, on May 2, 1983, the matter was set for trial on the Harrelsons' cross-complaint against the Hataburdas for fraud and negligent misrepresentation and on the Hataburdas' forcible entry and detainer action against the Harrelsons. Counsel for the Harrelsons moved to dismiss the four counts of their complaint which prayed for rescission of the contract to purchase. The motion was allowed and the trial proceeded on the remaining counts for restitution.

At the conclusion of the Harrelsons' case in chief, counsel for the Hataburdas moved for a directed verdict, which was denied. Then, Hataburdas' counsel moved for a dismissal of the forcible entry and detainer suit. After entertaining arguments of counsel and an offer of proof, the court granted the motion and informed the jury accordingly. The Hataburdas proceeded with their defense case, closing arguments of counsel were presented, the jury received instructions, and deliberations began at 2:55 p.m. on May 5, 1983.

The record reflects that the jury returned its verdict in open court at 9:40 p.m., finding in favor of the Harrelsons on the fraud counts and awarding $32,000 in compensatory and $50,000 in punitive damages. The jurors were admonished, however, that their verdict was incomplete because no finding had been made with respect to the negligent misrepresentation counts. The jurors deliberated further, and at 10:25 p.m., they returned another verdict for the Harrelsons and awarded $15,000 compensatory damages for negligent misrepresenta-

tion.

In this appeal, the Hataburdas contend that the Harrelsons' cross-complaint against them failed to state a cause of action for fraud; that they failed to prove fraud by clear and convincing evidence; that they failed to state a cause of action for negligent misrepresentation; that the jury's verdict is unsupportable; and that punitive damages were improperly awarded.

The evidence presented at trial, although disputed, tended to establish the following facts. Richard and Patricia Hataburda acquired an interest in the real estate at 725 Geneva Street, Romeoville, in 1976 when they assumed the mortgage obligation on the property that Mr. and Mrs. Roy Schneider had executed with Home Savings and Loan Association of Joliet. The mortgage agreement contained a due-on-sale clause requiring the mortgagors to obtain the mortgagee's written consent before transferring their interest in the property.

In July of 1978, Patricia Hataburda advertised the property for sale. Peggy Harrelson answered the ad and, pursuant to Patricia's instructions, met Patricia at Bel Air Realty in Bolingbrook. According to Mrs. Harrelson, she was shown three homes and liked the one at 725 Geneva. Mrs. Harrelson took her husband, Ernest, a truck driver, to see the home, and the Harrelsons decided they were interested in purchasing it. The sale price of $47,500 was acceptable to the Harrelsons. Peggy made a $500 cash deposit and the closing was set for September 23, 1978, at the Hataburdas' home. On that date, the Harrelsons were invited into Patricia's "office" and handed a contract entitled "Articles of Agreement" for their signatures. Although the Harrelsons had previously made real estate purchases on contract without the guidance of legal counsel, Ernest suggested on reading the contract that perhaps they should have a lawyer. The Hataburdas assured them, however, that everything was legal, that both of them were "real estate people," and that an attorney would not be necessary.

Ernest asked when the home would be paid off according to the terms of the contract, and he was told by Patricia that it would be in 30 years. Ernest and Peggy signed the contract and paid $2,000 for the balance of the down payment. They also paid for the first month's installment under the contract.

In 1981, the Harrelsons hired a contractor to repair some damage done to the home. The insurer issued a check to the contractor with the Harrelsons' and Home Savings' names as payees as well. Home Savings refused to endorse the check and notified the Hataburdas and

the Harrelsons that the due-on-sale clause in the mortgage agreement had been violated. The Harrelsons had no prior notice that the Hataburdas' mortgage included a due-on-sale clause. It was then discovered that the contract for purchase between the Hataburdas and the Harrelsons, under which the Hataburdas were ostensibly paying off a $45,000 balance (with interest at $9\frac{3}{4}\%$ per year) at the rate of $359.97 per month, would never result in a transfer of title to the purchasers because the monthly payment did not even cover the amount of interest that would be due each month under the terms of the contract.

At trial it was revealed that the Hataburdas had quit-claimed their interest in the property to Paula Hataburda, Richard's sister, in 1980 and recorded the transaction in January of 1983. It was also revealed that the Hataburdas had been dealing in real estate since 1974 and that several other contract sales, in which the Hataburdas purported to be sellers, had contained provisions similar to those in the instant case rendering a pay-off date impossible. Finally, evidence of income tax data provided by the Hataburdas to the Harrelsons for 1979 and 1980, indicating that part of the principal of the $45,000 balance originally owed on the property had been paid off each year, was admitted against the Hataburdas.

It is in light of the foregoing evidence of record that we review the issues presented on appeal. Initially, we find that the evidence was sufficient to prove clearly and convincingly that the parties' contract was induced by actual fraud. To establish their cause of action, the Harrelsons had to prove that Patricia's and Richard's misrepresentations were untrue statements of material fact, made with knowledge of their falsity for the purpose of influencing the Harrelsons, who relied on those representations and acted upon them to their detriment. (*Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 1109, 408 N.E.2d 782, 785, quoting *Zeilenga v. Stelle Industries, Inc.* (1977), 52 Ill. App. 3d 753, 757, 367 N.E.2d 1347, 1349.) The Hataburdas' failure to disclose to the Harrelsons that a due-on-sale clause in Home Savings' mortgage agreement was violated by the sale to the Harrelsons, and the Hataburdas' affirmative statement that the property would be paid off in 30 years are both misrepresentations which were proved at trial to have been made with the required degree of *scienter* on the part of the Hataburdas, and were reasonably relied upon by the Harrelsons to their detriment. Further, a due-on-sale clause similar to the one contained in Home Savings' mortgage was included by the Hataburdas in their contract with the Harrelsons. The jury's initial verdict, finding the Hataburdas liable in

fraud, is amply supported by direct evidence and circumstantial evidence giving rise to strong inferences that actual fraud, as opposed to mistake or mere negligence, was the motivating force behind the Hataburdas' conduct in procuring the Harrelsons' signatures and accepting regular monthly payments for property for which the title would never change hands according to the terms of the "purchase" agreement. Neither of the Harrelsons had completed high school. The Hataburdas held themselves out as knowledgeable real estate persons whose backgrounds were sufficient to obviate any need that the Harrelsons might otherwise have had for legal counsel in the real estate transaction. Mrs. Harrelson said that she liked and trusted Patricia during the parties' dealings up to and including the signing of the contract. The Harrelsons were obviously unsuspecting, easy prey for the sophisticated Hataburdas. Although the Harrelsons' testimony was not entirely consistent, it is apparent, even from the cold record before us, that they testified with honesty and candor. The Hataburdas' testimony, especially that of Patricia, was, on the other hand, fraught with about-face contradictions, and thoroughly impeached. We have absolutely no doubt that the jury was correct in concluding that the Harrelsons had satisfied their burden of proving the Hataburdas' fraud.

We consider next the issue of whether the jury's determinations of damages may be sustained in this case.

██ The allegations of negligent misrepresentations in counts V and VI of the cross-complaint essentially mirrored the allegations of fraud contained in counts I and II except, of course, for the differing elements of *scienter*. By returning their initial verdict in favor of plaintiffs on the fraud counts, it is clear that the jury found that the contract was procured by fraud, rather than negligence, on the part of the Hataburdas. We have determined that this finding is amply supported by the evidence. We hold, however, that the trial court committed error in entering judgment on the jury verdicts favoring plaintiffs on the less-culpable negligence counts. While certainly the plaintiffs were properly permitted to present both theories of recovery to the jury for its consideration and while the favorable verdicts for plaintiffs in both theories are not inconsistent on these facts, to permit both judgments to stand would amount to double recovery. Accordingly, we vacate that part of the judgment awarding plaintiffs $15,000 in compensatory damages for negligent misrepresentation.

██ The measure of actual damages, where the purchase of property is induced by fraud, is the difference between the value of the property as it in fact existed and the value that it would have had had

the seller's representations been true. (*Four "S" Alliance, Inc. v. American National Bank & Trust Co.* (1982), 104 Ill. App. 3d 636, 432 N.E.2d 1213.) Under this formula, the defrauded buyers are to be awarded the benefit of their bargain. In addition to actual damages, consequential damages proximately resulting from the fraud are recoverable, and punitive damages may be awarded where the defrauding party's conduct is found to be oppressive, gross or reprehensible.

■ It is apparent to us that the record sufficiently establishes that the Harrelsons suffered actual damages as a proximate result of the Hataburdas' fraud. However, we cannot arrive at the figure awarded by the jury for compensatory damages without a great amount of speculation on our part. At trial, plaintiffs introduced expert testimony of Daniel Maher, C.P.A., to establish that a $45,000 loan financed over 30 years in monthly installments at $9\frac{3}{4}\%$ interest would amount to $139,183.20 in total payments. This is the amount that the Harrelsons would have paid pursuant to the Hataburdas' representation that the home would be paid off in 30 years. By contrast, Maher testified, $45,000 amortized at a 13% interest rate would have meant that the Harrelsons would pay $179,284.40 in 30 years to acquire a deed to the property. The difference in the total amounts paid over 30 years at the two rates was $40,021.20. According to Dennis Wilson, who was vice-president in charge of the loan department of Home Savings of Joliet in 1981 when the complaint involved in this suit was filed, the average interest rate for home loans at the time of trial was $12\frac{1}{2}\%$. Another witness, however, Marty Madron, vice-president in charge of loans at the First Bank of Romeoville, testified that 30-year home loans were being offered at $13\frac{1}{4}\%$ rate of interest at the time of trial. Maher was unable to testify at trial what the total amount of payments would be for 30 years at $12\frac{1}{2}\%$ interest. The plaintiffs introduced evidence that they had paid $2,500 down on the contract by the time of closing in 1978 and had made 53 monthly payments under the contract at the rate of $438.97 ($359.97, plus taxes and insurance) per month thereafter. Finally, the Harrelsons testified that they had expended over $4,000 on repairs to the property. No evidence was introduced to establish that the Harrelsons had applied for a loan to pay the Hataburdas the balance owed on the property. And no evidence was introduced to establish that the value of the property in 1978 was worth anything more or less than $47,500, the purchase price shown on the parties' contract. Patricia Hataburda, in cross-examination, testified that according to an amortization table produced at trial the monthly payment amount for a $45,000 loan over 30 years at $9\frac{3}{4}\%$ interest would be $386.62 instead of $359.97 as indicated in

the parties' contract. This latter testimony has some relevance for a determination of actual damages. As we view the record the consequence of the fraudulently drafted contract forced the Harrelsons to engage counsel and defend lawsuits brought against them by Home Savings and the Hataburdas until those complaints were voluntarily dismissed. However, no basis for the amount of consequential damages, if any, allowed by the jurors by reason of the collateral suits can be found in this record.

The compensatory damages award for fraud must be fairly determinable by the amount which will give the Harrelsons the benefit of their bargain. They expected to purchase their home in 30 years on a contract requiring them to pay $359.97 per month on a $45,000 balance. What they received was a home that could not be paid off in 30 years unless they paid $386.62 per month on a $45,000 balance. Consequential damages which might have been incurred as a consequence of the fraud were not established with sufficient certainty to be capable of determination by this court.

■■ ■ Where compensatory damages cannot be determined from the record with a reasonable degree of certainty, a remand to the trial court is appropriate. In our opinion, the jury's $32,000 compensatory damages award is too speculative to be sustained. The jury's award of punitive damages is nonetheless sustainable. Particularly where, as here, actual damages are small in comparison to the outrageousness of the sellers' conduct, then substantial punitive damages may be appropriate to deter similar conduct by this seller and others. We do not find the $50,000 punitive damages award unreasonable in this case. The conduct of the Hataburdas was shown to be sufficiently oppressive and outrageous under these circumstances to support a finding that substantial punitive damages were necessary to serve the ends of justice. Accordingly, we remand this cause for a new trial on the issue of compensatory damages on the fraud counts only.

Affirmed in part, reversed in part, and remanded.

HEIPLE and SCOTT, JJ., concur.