134 Ill. App.3d 985 (1985)
481 N.E.2d 300
UNION NATIONAL BANK AND TRUST COMPANY OF JOLIET, Plaintiff and Counterdefendant-Appellant and Cross-Appellee,
v.
BARBARA F. CARLSTROM, a/k/a Barbara F. Hamilton, Defendant and Counterplaintiff-Appellee and Cross-Appellant.
No. 3-84-0808.
Illinois Appellate Court  Third District.
Opinion filed July 16, 1985.
*986 *987 Robert White, of White, Marsh & Mueller, of Ottawa, for appellant.
Robert D. Shutts, of Shutts & Shutts, of Joliet, for appellee.
Judgment affirmed.
PRESIDING JUSTICE HEIPLE delivered the opinion of the court:
Union National Bank and Trust Company of Joliet (the bank) appeals from a judgment for defendant Barbara Hamilton, a/k/a Barbara Carlstrom (Barbara). Barbara cross-appeals. We affirm on all counts.
Barbara was married to Dale Carlstrom (Dale), a dentist. During the course of his career, Dale took out several loans with the bank. Dale and Barbara also borrowed money from the bank for the purchase of their primary residence, a summer home and some farmland. During the period relevant to the instant case, Dale and Barbara did most of their business with Elton Bates, a vice president.
In November 1973, Dale sought additional financing to expand his dental practice. Bates agreed to make the loan, but only if a guaranty could be obtained from Barbara. Barbara signed an absolute, unconditional guaranty for up to $60,000 of Dale's indebtedness. Barbara testified at trial that she did not remember signing the guaranty. While admitting that the signature was hers, she testified to never reading the documents her husband placed before her to sign.
In September 1974, Dale filed for divorce. In October, Dale telephoned Bates to find out the balance of his notes to the bank. Bates responded with a letter detailing the notes. The letter also mentioned that Barbara had guaranteed the notes for $60,000.
Barbara hired attorney Richard Buck to represent her in the divorce *988 proceedings. At first, Barbara wanted to reconcile with Dale. When this appeared to be impossible, she instructed Buck to concentrate on working out a property settlement.
After meeting with Barbara to ascertain the extent of the Carlstrom's assets and liabilities, Buck concluded that he did not have adequate information. This was apparently also the conclusion of Dale's attorney, Perry Rudman. Either Buck or Rudman called Bates at the bank to set up a meeting to go over the Carlstrom's financial situation there.
The meeting was held on March 3, 1975. Although Bates had no independent recollection of the meeting, the evidence suggests that not only did the meeting take place, but that Bates had prepared for it to some extent. What occurred at the meeting was revealed only through Buck's testimony. Buck testified that he asked to look at the Carlstrom's files. Bates would not allow this, since other parties were mentioned in certain documents contained therein. Bates read from the files, and both attorneys took notes. Buck's notes were introduced at trial. They reveal that Bates gave a detailed description of Dale's borrowings over the years, the interest rates, nature and extent of collateral and various renewals granted by the bank. Bates also detailed the joint obligations of Dale and Barbara. At some point in the meeting, Bates instructed a secretary to prepare a tape on an adding machine totaling both Dale's individual debts and the couple's joint debts. The tape was introduced at trial. It listed Dale's debts at $92,375 and joint debts at $105,300. No mention was made of the guaranty at any time during the meeting. There is strong circumstantial evidence to suggest that not only was Bates aware of the guaranty's existence during the meeting, but that the guaranty instrument was in the files that Bates was reading through for the attorneys.
Based in part on the information obtained at the March 3 meeting, the attorneys negotiated a property settlement a few weeks later. The decree incorporating the settlement divided the assets and liabilities of the Carlstroms. No mention was made of the guaranty.
Dale remarried in 1975, but died in October 1976. The attorney for the executor of his estate testified that Dale's estate was insolvent. In 1977, the bank informed Barbara of its intention to proceed against her on the guaranty. She testified that this was her first knowledge of the existence of the guaranty.
The bank obtained a confession of judgment against Barbara for $60,000 plus costs and attorney fees. Barbara successfully moved to open the judgment. After numerous pleading battles, the cause went to trial with Barbara interposing an affirmative defense of estoppel *989 based upon the bank's concealment of the guaranty. She also filed a four-count counterclaim alleging fraud, wanton and wilful misconduct, gross negligence and a violation of the Federal Truth-in-Lending Act (15 U.S.C. § 1640 (1982)). Sitting without a jury, the trial court found for Barbara on the estoppel defense. Accordingly, recovery was denied on her negligence count for lack of damages. Punitive damages under the other common law counts was denied for lack of actual damages. The court dismissed the Federal count at the close of evidence.
 1 At the outset, we reject the bank's contention that the court erred in denying its motions to dismiss under former section 45 (now section 2-615 of the Code of Civil Procedure). The bank argues that the estoppel defense was inadequately alleged due to vagueness. We find that not only were the facts adequately presented to allow the bank to prepare its case, but that any vagueness was cured by ample opportunity for discovery. (Fanning v. Lemay (1966), 78 Ill. App.2d 166, 222 N.E.2d 815.) The bank also challenges the sufficiency of certain of the allegations as they relate to the elements of estoppel. These arguments go to the substance of the defense and will be discussed in detail below.
 2 It is also contended that the complaint inadequately alleges a duty on the bank's part to disclose information to its customers. Ordinarily, this is true. However, as the trial court correctly found, a party may assume a duty to disclose information accurately by its conduct. That clearly was the case here. The bank voluntarily gave a detailed description of the Carlstrom's dealings with the bank. In so doing it undertook a duty not to deliberately conceal or misrepresent. Dace v. Gilbert (1981), 96 Ill. App.3d 199, 421 N.E.2d 377.
The bank's principal argument on appeal is that the trial court's findings on the estoppel defense were against the manifest weight of the evidence and not supported by the applicable law.
The elements of equitable estoppel are as follows:
1. Words or conduct by the party against whom the estoppel is alleged amounting to a misrepresentation or concealment of material facts;
2. The party against whom the estoppel is alleged must have knowledge, either actual or implied, at the time the representations were made, that they were untrue;
3. The truth respecting the representations so made must be unknown to the party claiming the benefit of the estoppel at the time they were made and at the time they were acted on by him;

*990 4. The party estopped must intend or expect that his conduct or representations will be acted on by the party asserting the estoppel or by the public generally;
5. The representations or conduct must have been relied and acted on by the party claiming the benefit of the estoppel; and
6. The party claiming the benefit of the estoppel must have so acted, because of such representations or conduct, that he would be prejudiced if the first party is permitted to deny the truth thereof.
(Lowenberg v. Booth (1928), 330 Ill. 548, 162 N.E. 191.) Furthermore, the party asserting the defense must prove it by clear and unequivocal evidence. In re Estate of Frayser (1948), 401 Ill. 364, 82 N.E.2d 633.
The trial court provided a lengthy and well-considered memorandum in support of its judgment. Proof of each of the six elements of estoppel was found. The bank takes issue with the court's findings on three elements.
The bank argues that knowing misrepresentation or concealment was not proven by clear and unequivocal evidence. It points out that the sole evidence of misrepresentation or concealment came from Buck's testimony. It argues that as Buck could not recall the exact words used in requesting the information, it cannot be said with any certainty whether that request would necessarily include the fact that his client had executed a guaranty.
 3 This argument is, at best, unconvincing. Buck testified without contradiction that the substance of his request was for "everything" relating to the Carlstrom's assets, debts and obligations. Furthermore, there is pervasive circumstantial evidence that Bates' failure to reveal the existence of the guaranty reeked of the unpleasant odor of mendacity. It was Bates who requested the guaranty in the first place. He testified that he asks for a spouse's guaranty in 90% of the cases where, as here, there is substantial joint tenancy property. He had recently written to Dale concerning the extent of the notes and had mentioned the guaranty without prompting. The guaranty was also noted on a loan write-up sheet which almost certainly was within the files that Bates had with him at the meeting. It was also noted on a margin card listing the various properties held as security for loans. Finally, the evidence suggests that the guaranty itself was present in the files used by Bates at the meeting. Thus, the finding of a knowing misrepresentation or concealment is supported by the evidence.
 4 The bank argues that the truth respecting the guaranty was *991 either actually known to Barbara and Buck at the time of the meeting or was so readily available that Barbara should be deemed to have knowledge thereof. The first line of argument stems from the well-known principle that competent adults are presumed to know the nature of contracts to which they sign their names. (Carbone v. Sparks (1953), 350 Ill. App. 56, 111 N.E.2d 567.) While this was cited as a defect in Barbara's pleadings, it clearly is addressed to the sufficiency of the evidence on this element of estoppel.
While Barbara may be presumed to have knowledge of the existence of the guaranty, this presumption is rebuttable. The trial court's findings on this point are particularly well-taken. Not only was it shown that Barbara did not know what the guaranty was at the time of execution, but it is also clear that the bank, through its agents, knew that Barbara did not know of the guaranty. The whole point of the March 3 meeting was that neither Dale nor Barbara was completely cognizant of what they had signed. Thus, the presumption of knowledge of a contract cannot be bootstrapped into a finding of knowledge of the object of a concealment as a matter of law.
 5 The second line of argument is that Buck, Barbara's agent, had it easily within his means to discover the existence of the guaranty. All he had to do was to subpoena the bank's records. Hence, his failure to use a convenient means of obtaining information should be chargeable to Barbara.
We do not agree. There was extensive testimony from expert witnesses that Buck's modus operandi was proper under the circumstances. A subpoena was not necessary because the bank appeared to be voluntarily disclosing all that it had available. Moreover, it appears to have been a custom in Will County in 1975 to use informal discovery procedures in amicable, uncontested divorces. Therefore, the trial court's finding on this element of estoppel was not against the manifest weight of the evidence.
The final and perhaps most controversial element in question is that of detrimental reliance. In its initial memorandum, the trial court held that the concealment of the guaranty was detrimental to Barbara because it deprived her of her right to revoke the guaranty and cut off further renewals of Dale's notes (it was the renewal of notes following the divorce upon which the bank's claim against Barbara was founded). However, the bank pointed out in its post-trial motion that Barbara would have had to pay the old notes to revoke effectively (Lee v. Pioneer State Bank (1981), 97 Ill. App.3d 97, 423 N.E.2d 218). The court then issued a revised memorandum citing various courses of conduct available to Barbara had she known of the guaranty. *992 The inability to pursue these steps was found to be sufficient detrimental reliance to support the defense of estoppel.
Without listing the potential avenues of recourse, it is clear that all involved either the agreement of Dale, a circuit court or the payment of money from Dale to Barbara. The bank argues that detriment could not be shown in the case of those courses of action requiring third-party acquiescence because such acquiescence is necessarily a matter of speculation. As to payment of money, there is nothing in the record to suggest that Dale had the present ability to pay or that payment could have been obtained before Dale became insolvent.
 6, 7 That the proof of detrimental reliance is somewhat conjectural does not defeat the defense. It is not necessary to prove that the steps taken would have been successful. Rather,
"It is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss." (Emphasis added.) (3 Pomeroy, Equity Jurisprudence sec. 812 (5th ed. 1941).)
This doctrine is particularly apt in relation to the instant case. The guaranty here was subject to judicial treatment in an upcoming divorce. Because it was concealed, Barbara's attorney had no opportunity to take any measures to protect his client. Thus, as inaction was the inevitable result of the concealment, the fact that remedial measures that might have been taken were speculative is of no moment.
Defendant argues that the court erred in failing to strike certain testimony from Bates and Buck. Bates was asked a question in adverse examination regarding his transferring of the parties' assets following the divorce. The question was objected to as irrelevant. We need not address the court's justification for its allowance of this evidence. The question was so obscure and the subject matter so tangential to the main issues that any error stemming from admission was harmless. Gillespie v. Norfolk & Western Ry. Co. (1972), 3 Ill. App.3d 779, 278 N.E.2d 420.
Buck was asked about what he would have done if he had known of the guaranty relative to the final property settlement agreement. Defendant objected to the question as calling for conjecture. Needless to say, in light of our previous discussion of detrimental reliance, that Buck would in some sense be called upon to speculate was not improper under the circumstances.
 8 There was also an objection to the court's taking judicial notice that knowledge of the existence of the guaranty would have altered settlement negotiations. We agree that judicial notice of such a *993 fact is improper, as it is clearly not a matter of common and general knowledge (People v. Taylor (1968), 95 Ill. App.2d 130, 237 N.E.2d 797). However, as the court went on to state, that settlement negotiations would have been different is an inference that he as a finder of fact would be entitled to make. Again, that this inference is somewhat speculative is inconsequential in light of the nature of the defense of estoppel.
Barbara's cross-appeal seeks consequential and punitive damages for her counterclaims. The damages alleged are attorney fees and costs incurred in defending the bank's complaint. Barbara cites Home Savings & Loan v. Schneider (1984), 127 Ill. App.3d 689, 469 N.E.2d 585, for the proposition that punitive damages may be awarded based on consequential damages stemming from a fraud.
 9 Without addressing the absence of evidence of fees relating to defense of the complaint, it is clear that Schneider is distinguishable. The need for defense of the lawsuits in issue there emanated directly from the fraud practiced. Here, the original lawsuit had nothing to do with any fraudulent action. The guaranty was not fraudulently procured. Thus, the necessity of defending the complaint was not a proximate consequence of the alleged fraud.
Accordingly, we affirm the decision of the circuit court of Will County.
Affirmed.
SCOTT and WOMBACHER, JJ., concur.