(No. 61084.—

HOME SAVINGS AND LOAN ASSOCIATION OF JOLIET v. ROY E. SCHNEIDER *et al.* (Ernest L. Harrelson *et al.*, Appellees, v. Richard H. Hataburda *et al.*, Appellants).

*Opinion filed October 3, 1985.*

278

Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago (Nat P. Ozmon and Steven E. Nieslawski, of counsel), for appellants.

Stefanich, McGarry & Wols, Ltd., of Joliet (Roman R. Okrei, of counsel), for appellees.

JUSTICE MORAN delivered the opinion of the court:

This action was filed in the circuit court of Will County by Home Savings and Loan Association of Joliet (Home Savings), seeking enforcement of a "due-on-sale" provision in a mortgage executed by Roy E. Schneider and Sue C. Schneider. Also named as defendants were Richard H. Hataburda and Patricia D. Hataburda, who assumed the mortgage from the Schneiders with Home Savings' consent. In addition, the complaint named as

defendants Ernest L. Harrelson and Peggy J. Harrelson, who, without Home Savings' knowledge or consent, purchased the property on contract from the Hataburdas. The Harrelsons filed a cross-complaint against the Hataburdas, alleging fraud and misrepresentation in the sale of the property, and the Hataburdas counterclaimed against the Harrelsons for forcible entry and detainer.

The Hataburdas settled with Home Savings by paying off the balance outstanding on the mortgage. Home Savings therefore withdrew from the litigation. The Harrelsons' claims against the Hataburdas proceeded to trial, along with the Hataburdas' counterclaim. Shortly after commencement of the trial, however, the Hataburdas voluntarily dismissed their counterclaim.

At the conclusion of the trial the jury awarded the Harrelsons $32,000 in compensatory damages on the fraud counts of their complaint, and also awarded $50,000 in punitive damages. The jury returned no verdict on the Harrelsons' negligent-misrepresentation counts, and the trial court sent them back to reach a verdict on those counts. The jury then awarded an additional $15,000 in damages for negligent misrepresentation.

On appeal the appellate court affirmed the finding of liability for fraud (127 Ill. App. 3d 689, 693-94), but vacated the award for negligent misrepresentation (127 Ill. App. 3d 689, 694). The court noted that the fraud and negligent-misrepresentation allegations involved the same conduct, differing only in the scienter involved, and therefore the jury's initial award of damages for fraud precluded an award of additional damages for negligent misrepresentation. (127 Ill. App. 3d 689, 694.) The court also held that, while the Harrelsons had demonstrated damages, the $32,000 in compensatory damages was not supported by the evidence. (127 Ill. App. 3d 689, 696.) The court, however, upheld the award of $50,000 in

punitive damages and remanded for a new trial solely on the issue of compensatory damages. This court granted the Hataburdas' petition for leave to appeal.

The Hataburdas (hereinafter defendants) raise four issues for review: (1) Does the record support a finding that the Harrelsons sustained damage due to the defendants' fraudulent conduct? (2) Does the record support an award of punitive damages? (3) Was the jury instructed properly on the standard for a punitive damage award? and, (4) May the punitive damage award be affirmed despite the remand of the question of compensatory damages? The Harrelsons (hereinafter plaintiffs) raise an additional issue on cross-appeal: Did the appellate court err in overturning the jury's compensatory damage award?

The property in question is located at 725 Geneva Street in Romeoville. Defendants acquired an interest in the property in 1976 when they assumed the mortgage on the property originally executed by Roy and Sue Schneider in favor of Home Savings. The mortgage agreement contained a "due-on-sale" clause, making it a breach of the agreement for the mortgagors to transfer their interest in the property without Home Savings' written consent.

In July of 1978, Patricia Hataburda advertised the property for sale. Peggy Harrelson answered the advertisement and met Mrs. Hataburda outside the offices of Bel Air Realty in Bolingbrook. Mrs. Hataburda showed Mrs. Harrelson two houses in Bolingbrook, but Mrs. Harrelson did not like either house. Several days later Mrs. Hataburda telephoned Mrs. Harrelson and arranged another meeting at Bel Air Realty. This time Mrs. Harrelson was shown the property here in question. Mrs. Harrelson was interested in the home, and when Mr. Harrelson returned home from a truck-driving trip, Mrs. Harrelson took him to see the property. Mrs. Harrelson then telephoned Mrs. Hataburda to find out

what the monthly payments would be if they purchased the house.

Finally, in late September, 1978, both plaintiffs went to the defendants' home, where Mrs. Hataburda took them to a small room serving as her "office." Although Mrs. Hataburda did most of the talking at this meeting, Mr. Hataburda was present for part of the time. At this meeting Mrs. Hataburda presented the Harrelsons with a copy of the purchase agreement, calling for a $2,500 down payment, and a balance of $45,000 at a 9.75% annual interest rate. The contract called for monthly payments of $359.97 until the balance was paid in full. These monthly payments were the same amount that Mrs. Hataburda had told Mrs. Harrelson on the telephone. Mr. Harrelson asked when the home would be paid in full under the terms of the contract, and Mrs. Hataburda told him that the house would be entirely paid for in 30 years. Since the wording of the contract did not specify the 30-year period, Mr. Harrelson suggested that perhaps he and his wife should consult an attorney. Both Mr. and Mrs. Hataburda, however, assured him that everything was legal, that both of them were "real estate people" and knew what they were doing, and that no lawyer was necessary. Defendants did not inform plaintiffs of their mortgage agreement with Home Savings or the "due-on-sale" clause therein, although the contract with plaintiffs contained a similar provision. Also, defendants did not inform Home Savings of the sale, and in fact told Home Savings that they were renting the property.

In 1981 plaintiffs' home was vandalized, and they hired a contractor to repair the damage. Their insurer issued a check which named both the plaintiffs and Home Savings as payees. The plaintiffs had no idea why Home Savings was involved, and went to Home Savings' offices. They showed their installment contract to Dennis

Wilson, then a vice-president at Home Savings. Mr. Wilson informed plaintiffs that they were in violation of the "due-on-sale" provision of the Schneider-Hataburda mortgage. Wilson also told plaintiffs that their contract did not amortize, that is, their monthly payments were not quite sufficient to cover the interest due and therefore there would never be a reduction in principal. Home Savings then filed suit to enforce the "due-on-sale" provision.

The contract, as written, required plaintiffs to pay $359.97 per month. At trial Mrs. Hataburda testified, using an amortization table, that, in fact, at the interest rate stated in the contract, plaintiffs would have to pay $386.62 per month in order to pay off the stated balance in 30 years. Defendants claimed at trial that they mistakenly calculated an incorrect monthly payment, but plaintiffs rebutted this claim by introducing evidence of several other real estate transactions involving defendants where the contract did not amortize. Plaintiffs also introduced income tax statements which they received from defendants for 1979 and 1980. The statements showed a reduction in amount of interest paid, implying a reduction in principal. Evidence was also introduced showing that plaintiffs had little experience in real estate matters, whereas both defendants had extensive involvement in real estate transactions.

Based upon this evidence there is no question that plaintiffs suffered damage. Defendants fraudulently induced plaintiffs to sign a written contract which, when examined closely with the aid of an amortization table, did not conform to the agreement as orally explained to them. While plaintiffs had been told that they would own the property outright if they paid $359.97 per month for 30 years, in fact they could not pay off the contract in 30 years unless they paid $386.62 per month. Plaintiffs' damages are the difference between the $359.97 they

bargained for and the $386.62 they will have to pay in order to pay off the contract in 30 years.

As the appellate court correctly noted, there is no basis in the record for the amount of any consequential damages. (See 127 Ill. App. 3d 689, 696.) Therefore the jury's award of $32,000 in compensatory damages cannot be sustained. The present value of the difference between 360 monthly payments of $359.97 and 360 monthly payments of $386.62 is not a figure which, from the record before us, can be arrived at with absolute certainty, but it is clear that the figure is considerably less than $32,000. We therefore affirm the appellate court's ruling remanding for a new trial on the issue of compensatory damages.

We also agree with the appellate court's ruling that punitive damages are permissible in this case. Punitive damages are properly recoverable in a fraud action "where the false representations are wantonly and designedly made." (*Laughlin v. Hopkinson* (1920), 292 Ill. 80, 89.) While deceit alone cannot support a punitive damage award, such damages may be allowed "where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness." (292 Ill. 80, 89.) In the present case the evidence of several other similarly fraudulent transactions involving defendants, the misleading tax statements, and the fact that defendants actively discouraged plaintiffs from engaging counsel to look over the contract, all convince us that there is sufficient evidence for the jury to find that the false representations were wilfully and wantonly made.

We do not believe, however, that the jury was properly instructed on the issue of punitive damages. Defendants offered Illinois Pattern Jury Instruction (IPI), Civil,

No. 35.01 (2d ed. 1971), which reads:

"If you find that defendant was guilty of wilful and wanton conduct which proximately caused injury to the plaintiff and if you believe that justice and the public good require it, you may, in addition to any damages to which you find plaintiff entitled, award plaintiff an amount which will serve to punish the defendant and to deter others from the commission of like offenses."

The trial court refused this instruction, and instead gave an instruction which was identical in all respects except that it substituted the words "fraud and deceit" for the words "wilful and wanton conduct" in the IPI instruction. The instruction as given is not in accord with *Laughlin v. Hopkinson* (1920), 292 Ill. 80. The instruction allowed the jury to award punitive damages solely upon a finding of fraud, without requiring wilful and wanton conduct. While there is no clear test for determining when fraud amounts to wilful and wanton conduct, the question of whether the fraud in this case amounted to such conduct should have been submitted to the jury. Because defendants' instruction to that effect was refused, we reverse the award of punitive damages.

Because we are reversing the award of punitive damages we need not reach defendants' last issue regarding the propriety of upholding a punitive damage award while remanding the issue of compensatory damages.

Finally, since defendants do not here challenge the finding of liability, and there is ample evidence to support that finding, we can discern no reason for the issue of liability to be relitigated. See *Balestri v. Terminal Freight Cooperative Association* (1979), 76 Ill. 2d 451, 456; *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224.

In summary, we agree with the appellate court's findings that (1) plaintiffs have proved actual damages, (2) the record does not support the jury's compensatory

damage verdict, and (3) the record supports the submission of the issue of punitive damages to the jury. However, because of the improper jury instructions we disagree with the appellate court's ruling upholding the actual award of punitive damages.

Accordingly, the judgment of the appellate court is affirmed insofar as it reversed the judgment for compensatory damages and insofar as it affirmed that portion of the judgment imposing liability. The judgment of the appellate court is otherwise reversed. The judgment of the circuit court is affirmed insofar as it imposed liability but vacated as to damages. The cause is remanded to the circuit court of Will County for a new trial to determine the amounts of compensatory and punitive damages.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and vacated in part; cause remanded, with directions.*