**AMPAT/MIDWEST, INC.,**
Plaintiff–Appellant,
Cross–Appellee,

v.

**ILLINOIS TOOL WORKS INC.,**
Defendant–Appellee,
Cross–Appellant,

and

**Triangle Fastener Corp., Defendant.**

Nos. 89–1437, 89–1473.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1989.
Decided Feb. 16, 1990.

---

James R. Epstein, Robert Zaideman, Jerry A. Esrig (argued), Epstein, Zaideman & Esrig, Mary Ellen Dienes, Chicago, Ill., for AMPAT/Midwest, Inc.

Diane I. Jennings, Daniel I. Schlessinger (argued), Rowe W. Snider, Lord, Bissell & Brook, Chicago, Ill., for Ill. Tool Works, Inc.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Before us are the appeal and cross-appeal from a substantial judgment in a diversity suit charging fraud and breach of contract. The plaintiff, AMPAT, a large window and curtainwall contractor operating nationwide, was awarded the subcontract to install the windows in the Onterie Center, a 60–story building in downtown Chicago. A key step in installation is to anchor the window frame to the wall, and for this one needs anchors. "Tapcon" is the trade name of a carbon steel screw designed and manufactured by defendant Illinois Tool Works for use as a masonry anchor. From Triangle Fastener Corporation, the other defendant, AMPAT bought 30,000 Tapcons at a total price of $4,700; Triangle had bought them from Illinois Tool Works for $3,000. The subcontract between AMPAT and the builder of the Onterie Center specified stainless steel—not carbon steel—anchors. Carbon steel is more susceptible than stainless steel to stress-corrosion cracking, which occurs when stress is placed on a metal object that has become corroded from contact with water (or some other corroding substance), or when a metal object that is already under stress becomes corroded. Cf. *McLaughlin v. Union Oil Co.*, 869 F.2d 1039, 1044 (7th Cir.1989).

The Tapcons that AMPAT bought were defectively manufactured, and the consequence, according to AMPAT, was that the cost of performing the subcontract skyrocketed. AMPAT had no recourse against the prime contractor—if only because it had failed to use stainless steel anchors, as its subcontract required. Instead it sued Triangle Fastener and Illinois Tool Works for breach of warranty, and Illinois Tool Works for fraud as well. The jury exonerated Triangle Fastener but found Illinois Tool Works liable for breach of warranty and for fraud and awarded AMPAT more than $900,000 in compensatory damages, plus $500,000 in punitive damages. The district judge set aside the

award of punitive damages on the ground that Illinois law (which the parties agree governs the substantive issues in the case) does not authorize an award of punitive damages without circumstances of aggravation not present here. AMPAT does not appeal the dismissal of Triangle Fastener (which therefore is no longer a party), but it does appeal the setting aside of the award of punitive damages. Illinois Tool Works does not appeal the finding of breach of warranty, but does appeal the finding of fraud and the award of compensatory damages. The issues of fraud and damages are connected because most of the damages awarded AMPAT were consequential damages, which are fully recoverable in a fraud case, *Tan v. Boyke*, 156 Ill.App.3d 49, 55, 108 Ill.Dec. 229, 233, 508 N.E.2d 390, 394 (1987); *Home Savings & Loan Ass'n v. Schneider*, 127 Ill.App.3d 689, 695, 82 Ill.Dec. 941, 945, 469 N.E.2d 585, 589 (1984), rev'd in part on other grounds, 108 Ill.2d 277, 91 Ill.Dec. 590, 483 N.E.2d 1225 (1985), but often not in a pure contract case. *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 318, 113 Ill.Dec. 252, 258, 515 N.E.2d 61, 67 (1987); *Cencula v. Keller*, 180 Ill.App.3d 645, 650, 129 Ill.Dec. 409, 412, 536 N.E.2d 93, 96 (1989). The order of our discussion will be fraud, punitive damages, compensatory damages.

As there is no contention that the district judge made errors in his evidentiary rulings on liability or in his instructions to the jury, we construe the facts relating to liability as favorably to AMPAT as is reasonable. AMPAT began installing windows in the Onterie Center in the fall of 1984. On January 2, 1985, it discovered broken Tapcons among those it had used before Christmas to anchor sloped window frames. (Some of the windows in the building are not vertical, but instead slope inward.) The Tapcons had broken even though, since the glass had not yet been inserted in the frames, the frames were not bearing their full weight. An inspection two days later revealed that 30 to 40 percent of the Tapcons in the sides of the sloped window frames were broken.

The broken Tapcons were collected and shipped off in three groups for inspection. One group was inspected by a metallurgist named Geiselman, whom AMPAT had retained for this purpose. The others were inspected by two employees of Illinois Tool Works—Lyu, also a metallurgist, and Janusz, an engineer who testified that he did not understand Lyu's metallurgical reports. In addition, unused Tapcons were taken from the three boxes in which they had been shipped by Triangle Fastener and were given to Lyu and Geiselman to test. The test evaluations differed. Janusz at first found no problems. Later both he and Geiselman found defects in the Tapcons they inspected. They were minor defects, and neither he nor Geiselman thought they had caused the Tapcons to break; nevertheless Geiselman recommended, as a precautionary measure, that AMPAT replace all the Tapcons that Triangle had shipped to it. Lyu's findings were the most ominous: he found all six Tapcons in two of the three lots of unused Tapcons to be either seriously or marginally defective.

Enter, stage front, Patterson, the national sales manager for the division of Illinois Tool Works that manufactures Tapcons. Patterson told AMPAT's project manager that AMPAT was installing the Tapcons incorrectly, although in a grudging and inaccurate nod to Lyu's report he added that one of the three lots that had been inspected had been found to be marginal. The project manager wanted this in writing and Janusz drafted a letter for Patterson's signature that described two of the three lots as marginal. In the letter as mailed, however (dated January 28), Patterson changed the number of marginal lots to one and described the other two lots as okay; the problem, he said, had been "isolated" to the one lot. He promised to ship replacement Tapcons forthwith, bypassing Triangle, and said the replacements would be "fully inspected for compliance with our product design parameters." The letter attributed the problems AMPAT had encountered to the combination of the one lot's marginality and improper installation.

Patterson's letter was misleading. Not only had Lyu found defects in two lots rather than one, but he had found seriously defective Tapcons in those lots, not just marginally defective ones. Patterson's statement that the problem had been "isolated" to one lot made it sound as if Illinois Tool Works had found one marginal production run, implying that so long as it replaced the defective Tapcons from a different run the problem would not recur—especially since all the new Tapcons would be "fully inspected." In fact the "lots" to which the letter referred were simply the contents of three boxes in which Triangle Fastener had happened to ship Tapcons to the Onterie building site; the boxes were not identified with particular production runs. Lyu's findings—never communicated to AMPAT—supported the hypothesis that two-thirds of *all* the Tapcons that Illinois Tool Works had sold to Triangle Fastener were defective. Of course Lyu had been working with a small sample. And it is uncertain that the Tapcons were so defective that they flunked the specifications in Illinois Tool Works' sales literature. Tapcons just may not have been up to a job for which, after all, stainless steel anchors rather than carbon steel anchors had been specified. But after the initial failure and ensuing complaints by AMPAT, Illinois Tool Works knew what the Tapcons were being used for; and Patterson's letter was an implied representation that the replacement Tapcons he was shipping would do the job for which AMPAT wanted them.

A week after Patterson's letter was mailed, Janusz received a report of defective Tapcons at another building site. Tests run on them by Lyu revealed defects similar to those in the Tapcons at the Onterie Center. Illinois Tool Works did not tell AMPAT about this development.

In accordance with Patterson's promise that the replacement Tapcons would be fully inspected before being shipped, Lyu tested one Tapcon in each of the 30 boxes of replacements. Twenty-six of the 30 Tapcons that he tested flunked, but the replacements were shipped anyway and AMPAT was not told about the test results. AMPAT received the replacements on February 12 and began installing them—and a month later discovered that a large percentage (perhaps as many as a third) of the installed replacement Tapcons had broken, just like their predecessors. At this point AMPAT stopped using Tapcons and added additional anchors (made by another manufacturer) to the windows that it had installed already. Expert evidence at trial established that the Tapcons, both the original and the replacement ones, had broken because of stress-corrosion cracking due in part to deficiencies in the manufacturing process at Illinois Tool Works' plant.

■ A reasonable jury could conclude, to the degree of confidence implied by the "clear and convincing" standard applicable to a fraud case, *Beaton & Associates, Ltd. v. Joslyn Mfg. & Supply Co.*, 159 Ill. App.3d 834, 842, 111 Ill.Dec. 649, 653, 512 N.E.2d 1286, 1290 (1987), that Illinois Tool Works had committed fraud in the form both of misrepresentations and of omissions. The misrepresentations concerned the results of Illinois Tool Works' metallurgical testing and the frequency and gravity of the defective Tapcons; Patterson's letter of January 28 is the key exhibit here. The omissions were the repeated failures by Illinois Tool Works to come clean about the defects, and included the failure to disclose the problem of defective Tapcons at another site (which might have alerted AMPAT to the inaccuracy of Patterson's letter) and, more seriously, the failure to disclose the disastrous results of Lyu's tests of the replacement Tapcons.

■ For an omission to rise to the level of fraud, however, there must be a duty to disclose. *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1327 (7th Cir.1989). This requirement is satisfied. If a product fails to perform in the manner warranted by its manufacturer—the Tapcons carried a general warranty to anchor window frames to concrete walls and, after Patterson's letter, a specific warranty to anchor the window frames in the Onterie Center—the manufacturer has a duty to reveal to the buyer facts known to it that bear on the cause of the failure and

would if revealed enable the buyer to avert or minimize the adverse consequences of the failure. The seller cannot sit idly by while the buyer flails about trying to cope with the failure of the seller's product. The duty we are positing is an aspect of the duty of good faith that is read into every express contract in Illinois. *Harrison v. Sears, Roebuck & Co.*, 189 Ill. App.3d 980, 991, 137 Ill.Dec. 494, 501, 546 N.E.2d 248, 255 (1989). The parties to a contract are embarked on a cooperative venture, and a minimum of cooperativeness in the event unforeseen problems arise at the performance stage is required even if not an explicit duty of the contract. Cf. *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 619–20 (7th Cir.1989). A seller who has reason to know that the failure of his product to perform in the manner warranted is due to a defect in the product can neither keep silent while knowing the nature of the problem nor pretend that the failure is really due to improper installation by the buyer or to an isolated problem that will be corrected by the shipment of replacement product. Such a seller commits fraud.

■ To be actionable, however, fraud must induce reliance—must in other words be both believed (if it is not believed, it can hardly be described as fraud) and acted on. *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980). Unless both conditions are fulfilled, the "fraud" is harmless, and without harm there is no tort. *Latigo Ventures v. Laventhol & Horwath, supra*, 876 F.2d at 1326. Illinois Tool Works argues that AMPAT, having hired its own metallurgist, knew as much about the problem with the Tapcons as Illinois Tool Works did. If true this would be a good defense. *Peterson Industries, Inc. v. Lake View Trust & Savings Bank*, 584 F.2d 166, 168 (7th Cir.1978) (per curiam); *Norris v. Wirtz*, 818 F.2d 1329, 1334 (7th Cir.1987); *Spartech Corp. v. Opper*, 890 F.2d 949, 955 (7th Cir.1989); *Dixie–Portland Flour Mills, Inc. v. Nation Enterprises, Inc.*, 613 F.Supp. 985, 990 (N.D.Ill.1985). It is almost true. AMPAT had its own metallurgist, Geiselman, who reported that the original batch was defective. But Geiselman did not examine the *replacement* Tapcons. He had no reason to. Patterson's letter was calculated to lull any doubts that Geiselman (and AMPAT generally) might have had about replacements. *West v. Western Casualty & Surety Co.*, 846 F.2d 387, 394–95 (7th Cir.1988). AMPAT relied on Patterson's letter—and was entitled to rely. That a more cautious buyer might not have relied, might have smelled a rat, does not defeat liability. There is no defense of contributory negligence to an intentional tort, including fraud. *Broberg v. Mann*, 66 Ill.App.2d 134, 140–41, 213 N.E.2d 89, 92 (1965); *FDIC v. W.R. Grace & Co., supra*, 877 F.2d at 618–19; *Greycas, Inc. v. Proud*, 826 F.2d 1560, 1562 (7th Cir.1987); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528 (7th Cir.1985).

■ This principle coexists uneasily, however, with a requirement that the victim of a fraud prove justifiable, or in other words reasonable, reliance, implying *some* duty of care on the part of the victim. *Chicago Title & Trust Co. v. First Arlington National Bank*, 118 Ill.App.3d 401, 407–10, 73 Ill.Dec. 626, 631–32, 454 N.E.2d 723, 728–29 (1983); *Luciani v. Bestor*, 106 Ill.App.3d 878, 883, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (1982). How are these principles—no duty of care (that is, no defense of contributory negligence) but a duty of *reasonable*, not just any old, reliance—to be reconciled? We struggled with this question in *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370–71 (7th Cir.1988), as did the Illinois Appellate Court in *Chicago Title & Trust Co. v. First Arlington National Bank, supra*, 118 Ill.App.3d at 409, 73 Ill. Dec. at 632, 454 N.E.2d at 729; cf. Prosser and Keeton on the Law of Torts § 108, at pp. 749–53 (5th ed. 1984). We think it comes down to this: while the victim of an ordinary accident is required to use the ordinary care of an average person (even if he is below average in his ability to take care)—and thus to avoid being *negligent*— the victim of a deliberate fraud is barred only if he has notice of the fraud, and so he need only avoid *deliberate* or *reckless* risk-

taking. *Smith v. Ethell*, 144 Ill.App.3d 171, 98 Ill.Dec. 742, 494 N.E.2d 864 (1986).

These attenuated duties of care that a fraud victim has are two, not one. The victim "cannot close his eyes to a known risk." *Teamsters Local 282 Pension Trust Fund v. Angelos, supra,* 762 F.2d at 530. But, beyond that—and the crux of the present case—he cannot close his eyes to a risk that is obvious, *Costello v. Liberty Mutual Ins. Co.,* 38 Ill.App.3d 503, 507, 348 N.E.2d 254, 257 (1976), even if he does not himself perceive the risk. Although not required to expend a substantial effort to protect himself (as a tort victim in a regime of contributory negligence will often be required to do), the potential victim of a fraud may not ignore a manifest danger. That is recklessness. It differs by only a shade, if that, from intentional conduct—the conscious assumption of risk that defeats liability under the first aspect of the duty of reasonable reliance as we conceive it. *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.1985).

The requirement of not being reckless serves in the law of fraud not only to define a duty, but also to disambiguate evidentiary ambiguities concerning the very existence of the fraud. If the victim acted recklessly in the face of the alleged fraud, it is difficult to believe that he was actually deceived; he may simply regret having assumed a risk that has turned out badly. The requirement of justifiable reliance backstops the jury's determination of actual reliance. It is on this theory that a person who plays ostrich may be held to have acted deliberately: to know, and to want not to know because one suspects, may be, if not the same state of mind, the same degree of fault. *United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir.1986).

"Degree" is the right word; we are speaking of differences of degree rather than of kind. The spectrum is continuous between involuntary conduct at the one end and deliberate action on full information at the other. There are no clean breaks marked "involuntary," "unavoidable," "negligent," "grossly negligent," "reckless," "deliberate." If contributory negligence were the test, the victim of fraud might be barred from recovering damages if he had any reasonable opportunity to ascertain the truth of the representation. But with reasonable reliance the test, his opportunity must be "ample," as the Supreme Court of Illinois said in *Schmidt v. Landfield,* 20 Ill.2d 89, 94, 169 N.E.2d 229, 232 (1960)—a formulation that brings out the continuous character of the variable and that implies that, unlike the victim of a nondeliberate tort, the victim of a fraud is not obliged to dig beneath apparently adequate assurances, such as Patterson conveyed in his letter of January 28, merely because the circumstances might engender suspicion in the proverbial reasonable man. *Teamsters Local 282 Pension Trust Fund v. Angelos, supra,* 762 F.2d at 529.

There are reasons for the distinctions in the degrees of care that tort law requires of victims. The deliberate tortfeasor can prevent the harm at lower cost—for he need only refrain, in order to avert it—than the victim who must exert himself, even if only slightly, to avoid the harm. Moreover, transaction costs would rise if law induced buyers to regard the unequivocal assurances of their sellers with flinty-eyed skepticism—to regard them indeed as lies necessitating potentially elaborate self-protective measures such as, in this case, AMPAT's directing Geiselman to test the replacement parts despite Patterson's unequivocal written assurance that they would be fully tested by Illinois Tool Works, their designer and manufacturer. Trust is economical—a substitute for costly methods of self-protection. *Id.* at 528. The law of fraud fosters trust by protecting the trusting, though only up to a point. *Soules* speaks of "facts of which plaintiff . . . 'might have availed himself by the exercise of ordinary prudence,'" 79 Ill.2d at 286, 37 Ill.Dec. at 599, 402 N.E.2d at 601, but this language appears to be a vestige of the *caveat emptor* era, when (as pointed out in *Chicago Title & Trust Co.*) victim duties were sterner than they are today.

An additional point may dissolve the debate over the difference between contrib-

utory negligence and reasonable reliance: ordinary prudence—the test for contributory negligence as well as the term used in *Soules* in explicating (perhaps inadvertently) reasonable reliance—varies with the circumstances. It is not ordinary prudence to assume that your seller is a liar. And just because AMPAT knew that some of the Tapcons had proved defective—more perhaps than Patterson would acknowledge—it does not follow that AMPAT also knew, or was reckless in failing to discover, that the replacement Tapcons were defective too, despite Patterson's assurances. Cf. *General Foods Corp. v. Valley Lea Dairies, Inc.*, 771 F.2d 1093, 1101–05 (7th Cir.1985) (dissenting opinion). AMPAT could reasonably assume that the manufacturer of the Tapcons knew more about them than Geiselman did. And it could reasonably assume that, having been caught shipping defective product once, Illinois Tool Works would not turn around and supply the same defective product to the same buyer again.

Illinois Tool Works asks, rhetorically, *why* it would commit fraud exposing it to substantial liability on a sale that yielded it gross revenues of only $3,000. That is indeed a puzzle. But the puzzle, while perhaps undermining the jury's finding of fraud somewhat, strengthens rather than weakens the case for justifiable reliance: AMPAT had no reason to think that Illinois Tool Works would behave *irrationally*, and to take protective measures accordingly.

The explanation for the puzzle may lie in a divergence of objectives between Patterson and his employer—the well-known problem of agency costs. However this may be, it is not a defense to fraud that the defendant erred in thinking fraud the profit-maximizing response to the problem in which it found itself. Litigation arises from the pathology of social interactions, so we should not be surprised that often parties to litigation appear to have acted from incomprehensible motives, behaved irrationally, misconceived their self-interest, exhibited bizarre deviations from rationality. It was for the jury to decide whether this was such a case, or whether, as Illinois Tool Works argued, the defects in the Tapcons were trivial and the main cause of their breaking was incompetent installation.

■■■■ So there was liability; should punitive damages have been allowed as a sanction for it? Fraud not only is a deliberate tort but also involves concealment, and on both counts an award of punitive damages might appear to follow as a matter of course from a finding of liability. See *FDIC v. W.R. Grace & Co., supra*, 877 F.2d at 623, on the significance of concealment. The Illinois courts, however, take rather a dim view of punitive damages, *Beaton & Associates, Ltd. v. Joslyn Mfg. & Supply, supra*, 159 Ill.App.3d at 845–46, 111 Ill.Dec. at 656, 512 N.E.2d at 1293, and insist that the plaintiff seeking them demonstrate not only simple fraud but gross fraud, breach of trust, or " 'other extraordinary or exceptional circumstances clearly showing malice and willfulness.' " *Home Savings & Loan Ass'n v. Schneider*, 108 Ill.2d 277, 284, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985). Moreover, it is for the judge rather than the jury to decide whether the standard is satisfied. *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 186, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978); *Parsons v. Winter*, 142 Ill.App.3d 354, 360, 96 Ill.Dec. 776, 781, 491 N.E.2d 1236, 1241 (1986). (If it is, the jury then determines the amount of the damages.) And while the division of functions between judge and jury in federal court may well be a matter of federal law, and one with constitutional overtones by virtue of the Seventh Amendment, *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 970–71 (7th Cir.1983), neither party to this appeal suggests that the Illinois cases that we have just cited misdescribe the proper division in either federal or state court.

■■■■ The district judge found that AMPAT had failed to make the showing required for an award of punitive damages under Illinois law. We cannot say that this finding is unreasonable, given the broad discretionary character of the Illinois standard, which invites deferential appellate re-

view. "[W]here a plaintiff's factual allegations are sufficient to state a legally cognizable claim for punitive damages, the trial court has discretion to submit the issue to the jury, and the court's determination will not be disturbed absent an abuse of that discretion." *Motsch v. Pine Roofing Co.,* 178 Ill.App.3d 169, 177, 127 Ill.Dec. 383, 388, 533 N.E.2d 1, 6 (1988); cf. *Mosey Mfg. Co. v. NLRB,* 701 F.2d 610, 615 (7th Cir. 1983) (en banc). There was disagreement between Janusz and Lyu over the gravity of the defects in the Tapcons, and even AMPAT's metallurgist was unsure whether the defects were responsible for the breaking of the Tapcons, though admittedly he had less information than Illinois Tool Works did. Patterson should not have lied, but he had some reason to believe that it was AMPAT's installation, rather than the defects in the Tapcons, that was responsible for the breaking. And while it is both true, and relevant to the degree of Illinois Tool Works' wrongdoing, that the defective Tapcons posed a safety hazard, there is no indication that the hazard was great. So far as the record reveals, no window frames ever did fall out of the Onterie Center, and this is a clue (though nothing more) to the magnitude of the safety hazard created by the fraud. Viewed as they must be in the light most favorable to AMPAT, the facts disclose highly irresponsible behavior by Illinois Tool Works, to be sure. But there is no suggestion that the fraud was designed to make money (Illinois Tool Works waived its charge for the replacement Tapcons) or to hurt AMPAT. Patterson probably was convinced that improper installation rather than defective installation really was at the root of the problem. Even deep conviction of the rightness of one's cause does not justify fraud; but, everything considered, we cannot say that the judge misapplied the Illinois standard for granting punitive damages.

Perhaps, too, the judge thought he was doing rough justice by vacating the award of punitive damages, since the award of compensatory damages was so generous. Illinois Tool Works argues that it was too generous, and maybe this is right; but the standard is whether a reasonable jury could have awarded the damages it did, and the answer (as we are about to see) is yes, given the state of the record and the arguments by the parties. Generally courts are not supposed to do rough justice—they are supposed to do legal justice—but the Illinois standard for punitive damages gives the district judge a very broad discretion. This was a close case on liability for fraud, and it makes sense to scale down an award of damages in recognition of a distinct possibility that the judgment may be premised on a mistaken finding of liability. *Jordan v. Duff and Phelps, Inc.,* 815 F.2d 429, 441–43 (7th Cir. 1987); *id.* at 452 (dissenting opinion); *DePass v. United States,* 721 F.2d 203, 206–10 (7th Cir.1983) (dissenting opinion). The heavier the sanction, the more confidence there should be that it is justified. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Brock v. Roadway Express, Inc.,* 481 U.S. 252, 261–62, 107 S.Ct. 1740, 1747, 95 L.Ed.2d 239 (1987); *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 543–45, 105 S.Ct. 1487, 1494–95, 84 L.Ed.2d 494 (1985); *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982); *Fleury v. Clayton,* 847 F.2d 1229, 1231–32 (7th Cir.1988). So, if there is doubt about justification, but not enough to warrant reversal, a sensible response is to cut down the sanction. That was done here without serious harm to the plaintiff. AMPAT received a generous award of compensatory damages; all that has been taken away from it is a windfall.

The last issue is whether the award of compensatory damages can be sustained. The principal items of compensatory damages that AMPAT sought and obtained were two. First was the cost of replacing the defective Tapcons with a different anchor. As to this item of damages, Illinois Tool Works' only argument is that the underlying data were presented to the jury in the form of summaries that did not satisfy the requirements of Fed.R.Evid. 1006, because the underlying data had been gathered for use in litigation and therefore were not the records of a "regularly con-

ducted business activity"; such records are admissible under the hearsay exception in Rule 803(6). Summaries of records prepared for litigation are indeed inadmissible. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259–60 (9th Cir.1984). Litigation is not a "regularly conducted business activity," and this for the practical reason that documents prepared specifically for use in litigation are (in Judge Jerome Frank's immortal words) "dripping with motivations to misrepresent." *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir.1942), aff'd, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). They are therefore inadmissible; and inadmissible documents are not made admissible by being summarized. However, the cost and other data on which AMPAT based its estimates of damages were taken from AMPAT's regular business records. The only addition in contemplation of litigation was a special coding to identify the particular installations affected by the alleged fraud. The data themselves were not manufactured for the litigation; they were lifted out of regular business records. So they were admissible, and likewise the summaries of them.

■■■ Moreover, "if of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed.R.Evid. 703. AMPAT's damages witness was its project manager for the Onterie Center installation, and although not designated as an expert witness he would easily have qualified under the liberal standard of Fed.R. Evid. 702. Cf. *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir.1988). The admission of the summaries he prepared was within the spirit if not the letter of Rule 703 as well as within the spirit and the letter of Rule 1006.

■■■ Illinois Tool Works mounts its main attack on what AMPAT calls its "impact damages," consisting of the extra costs it incurred in installing windows after the broken Tapcons were discovered, and amounting to two-thirds of the total damages. The impact damages were the difference between AMPAT's average cost of installation in the first three months of the job (October through December), before the broken Tapcons were discovered and replaced (eventually by a different anchor altogether), and AMPAT's average cost of installation (not replacement) for the remainder of the job, multiplied by the number of windows installed after December 31. AMPAT argues that the cost of installation was higher after that date because of the disruption in the installation schedule that ensued from the discovery of the broken and cracked Tapcons. The pace of the installation slowed down, which raised the cost because AMPAT's installers found themselves working behind rather than ahead of the crews doing other work in the building. Furthermore, AMPAT had to divert its most experienced crews to replacing the anchors in the windows that had already been installed, and the less experienced crews that were used to install the new windows worked more slowly. And the replacement anchors were of a different size, and the crews had to redrill the window frames in order to insert them.

Illinois Tool Works criticizes AMPAT's failure to make an adjustment in its calculation to take care of other, nonculpable causes of the higher average cost of installation after December 31. In particular it stresses the colder weather in winter than in fall and notes that the Chicago winter of 1985 was a particularly harsh one. Moreover, the windows for the lower floors are installed before the windows for the upper ones and it takes longer for the crews to reach the upper floors, which were the floors on which windows were being installed after December 31. AMPAT ripostes that normally the average cost of installation falls with the progress of the job, because the installers are moving down the learning curve (learning by doing), and that the lower floors of the Onterie Center, being less uniform than the upper ones, required more complicated installation.

■■■These various effects, although tugging in opposite directions, might not, of course, be equal and so cancel out. In a world of zero litigation costs, therefore, we would insist on the plaintiff's using modern

statistical techniques for identifying the partial effect of different explanatory variables, such as weather and broken Tapcons. But in our real world of positive and steep litigation costs, and considering that few contract cases involve substantial stakes warranting heavy expenditures on expert testimony, we hold that the plaintiff satisfies his burden of production by presenting a simple before-and-after comparison accompanied by a plausible though not necessarily conclusive connection between the difference and the defendant's wrongdoing. If the defendant is unconvinced, he can hire an expert to do a multivariate analysis designed to break the connection. Cf. *Allen v. Seidman*, 881 F.2d 375, 378–80 (7th Cir.1989). Illinois Tool Works presented no damages evidence. It was content to take pot shots at the plaintiff's evidence. This is a risky strategy, *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 823 (7th Cir.1985), and it failed. This damages verdict was not "pure guesswork," *FDIC v. W.R. Grace & Co., supra,* 877 F.2d at 624, and must stand.

■ It must stand even though there seems to be a large hole in the plaintiff's damages case. There was no fraud until Patterson's letter of January 28 (or, at the earliest, his telephone conversation with AMPAT's project manager a few days earlier). Yet AMPAT's impact damages (twothirds of its total damages) included costs it had incurred in reanchoring the windows that it had installed before then. These damages were recoverable if at all only for breach of warranty; and to the (undetermined) extent that they were consequential damages, they may not have been recoverable on that basis. But as Illinois Tool Works has never made this argument, it is waived (perhaps because of a flaw in the argument that we have not detected). We conclude that the judgment, in its entirety, must be

AFFIRMED.