**Charles BELLOCK and Patricia Bellock, Plaintiffs,**

v.

**ORKIN EXTERMINATING CO., INC., a foreign corporation, Defendant.**

**No. 89 C 6826.**

United States District Court, N.D. Illinois, E.D.

Dec. 4, 1990.

Michael J. Goggin, Oak Park, Ill., for plaintiffs.

Richard J. O'Brien, Stephan V. Beyer, and Mark B. Blocker, Sidley & Austin, Chicago, Ill., for defendant.

### ORDER

NORGLE, District Judge.

Before the court is the motion of defendant Orkin Exterminating Co., Inc. ("Orkin") to dismiss plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). For the reasons discussed below, the motion is granted.

## FACTS

On September 8, 1989, plaintiffs Charles and Patricia Bellock (the "Bellocks") filed a one count complaint against Orkin, alleging that Orkin violated their right to privacy by using their name in telephone solicitations which promoted Orkin's services in their Hinsdale, Illinois neighborhood. The Bellocks acknowledge that "in or about 1986," Orkin performed pest control services at their residence. Complaint, ¶ 10. The Bellocks claim that in November of 1988, Orkin phoned households in their neighborhood[1] and told residents that the Bellocks had a rodent problem and were Orkin customers. Complaint, ¶ 11. The Bellocks allege that Orkin's use of their name in connection with the solicitation of its services caused them "extreme embarrassment and humiliation and ... severe mental pain and anguish," and diminished the value of their property.

The Bellocks allege diversity (pursuant to 28 U.S.C. § 1332(a)(1)) as the sole basis for federal jurisdiction, claiming that they and Orkin are citizens of different states and that the amount in controversy, exclusive of interest and costs, exceeds $50,000. Orkin has moved to dismiss the complaint for lack of subject matter jurisdiction on the grounds that the amount in controversy does not exceed $50,000.

## DISCUSSION

■■■ For the purposes of Fed.R.Civ.P. 12(b)(1), the amount in controversy claimed by a plaintiff in good faith will be determinative on the issue of jurisdictional amount, unless it appears to a legal certainty that the claim is for less than that required by the rule. *Lichter v. Paine, Webber, Jackson & Curtis, Inc.*, 570 F.Supp. 533 (N.D. Ill.1983). However, when the court's jurisdiction is challenged as a factual matter, the court is not bound to accept the allegations of the plaintiff's complaint. *LaSalle*

*Messinger Paper Co. v. Climax Press, Inc.*, No. 89 C 3661, 1989 WL 96454 (N.D. Ill. August 14, 1989) (available on LEXIS, Genfed library, Dist file). Where jurisdiction is challenged, the party invoking the jurisdiction bears the burden of supporting its jurisdictional allegations by "competent proof." *Grafton Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979), *citing*, *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) ("the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence"). *See LaSalle Messinger*, slip op. at 5. The plaintiff is entitled to considerable latitude in supporting his allegations; he must be given the benefit of any facts he could conceivably prove in support of his allegations. *Lichter*, 570 F.Supp. at 536.

■■ In their Response to Defendant's Motion to Dismiss ("Response"), the Bellocks assert five different damage theories in an effort to show that at least $50,000 is in controversy in this case.[2] The first theory is based upon general allegations of "[c]ompensation for ... mental anguish, embarrassment and humiliation." Response, p. 9. The only evidence before the court supporting this damage theory is found in plaintiffs' interrogatory responses which Orkin attached as an exhibit to its motion. In Interrogatory 17, plaintiffs are asked to describe the mental anguish, humiliation and embarrassment which they allegedly suffered. The Bellocks respond: "See answers to interrogatories 10 and 11 above. People around the neighborhood and the office continually make jokes about the Bellocks' 'Rodent Problem.'" Motion to Dismiss, Exhibit B, p. 14. In response to Interrogatory 10, the Bellocks state, in essence, that their anguish is caused by the knowledge that: "friends and neighbors believe or may believe that the Plaintiffs used their name in solicitations made to "several" people.

---

1. In its motion to dismiss, Orkin notes that the Bellocks' interrogatory responses identify only one neighbor who allegedly received such a call from Orkin. The Bellocks respond that when they contacted Orkin to complain about the use of their name, they were told that Orkin had

2. Plaintiffs attached to their Response the affidavit of plaintiff Charles Bellock. On November 16, 1990, the court granted Orkin's motion to strike the affidavit.

were so ... 'money hungry' ... as to allow the use of their names for such commercial purposes"; "people think or may think that the Plaintiffs are sloppy, untidy, messy, dirty....[and] are also likely to believe that Mrs. Bellock is a terrible homemaker"; and "people ... may be afraid to go to the Plaintiffs' home for fear of coming into contact with rodents." Motion to Dismiss, Exhibit B, p. 8.[3]

The Bellocks' second damage theory is that they are entitled to "the commercial value of their names, *i.e.*, what Orkin should pay the Bellocks for the use of their names." Response, p. 9. The Bellocks provide no evidence of what this amount should be.

The Bellocks claim that Orkin's profits may be used as a third measure of damages. They claim that if four to twelve people hired Orkin after hearing the Bellocks' name mentioned in a solicitation call, damages under this theory would be $5,200 to $15,600, assuming that Orkin charges $1,300 per household for its services.[4] Notably, the Bellocks have not presented "competent proof" that four to twelve people received Orkin's offending solicitation.[5]

As their fourth damage theory, plaintiffs state that the value of their home has been diminished as a result of Orkin's actions. They claim that the value of their house has been diminished by up to 25% due to Orkin's solicitation of their neighbor(s). In support of their devaluation theory, the Bellocks have supplied the court with a letter written by Sylvester J. Kerwin, Jr., a professional real estate appraiser. In the letter, Mr. Kerwin renders a general opinion on the potential effect of an "adverse rumor" on the value of real estate, but he makes no attempt to appraise the Bellock home or to estimate the effect of the instant "rumor" on the value of plaintiffs' residence. Mr. Kerwin writes:

> Some of the types of adverse factors, or "rumors" that can have a negative effect upon market value of residential properties include murders or deaths of individual(s) by unusual circumstances, sickness or incurable diseases, rodents, termites or bug infestation, haunted or spiritual occurences, as well as other similar "unusual" events.
>
> .       .       .       .       .
>
> In my experience in observing the marketplace, an offer of as high as 25% below the asking price is not unusual in these situations. However, I am of the opinion that a reasonable estimate that could be attributable to this type of loss in value, as a result of an adverse "rumor" could range from 5% to 15% of the market value of the property, assuming this factor was present.

Response, Exhibit C.

This letter hardly provides "competent proof" that the Bellock residence has diminished in value at all, let alone by 5 to 15 or 25 percent. Assuming the truth of all the statements in the letter, the court finds no evidence that the alleged "rumor" of the Bellocks' "rodent problem" has had any effect on the property value of the Bellock home. Notably, Mr. Kerwin offered no opinion on any facts specific to this case. Even if the Bellocks could establish that not one but "several" of the Bellocks' neighbors believe that plaintiffs had used Orkin's services for rodent extermination, such a showing is not enough. For the information regarding the Bellocks to constitute a "rumor" falling within the category of "adverse factors" contemplated by

---

3. The answer to Interrogatory 11 merely identifies the one neighbor, Mrs. Blair, who the Bellocks claim received an offending solicitation call from Orkin.

4. The court notes that the Bellocks confuse revenues with profits. Assuming that Orkin indeed charges $1,300 per household for its services, this amount reflects Orkin's gross revenues, and not its profits. Orkin's profits may be only a fraction of the Bellocks' estimate of its gross revenues. The court further notes that the Bellocks provide no evidence to support their estimates, which appear to be little more than speculation.

5. Plaintiffs' estimate appears to be based solely upon the alleged admission of Orkin's Villa Park branch manager that the offending solicitation had been made to "several" neighbors, and that Orkin had set up "introductory appointments" with "several potential customers." Response, pp. 1, 7.

Mr. Kerwin, it would have to be so widespread and pervasive as to reach prospective buyers of the Bellock home.

Further, "rumors" that Orkin has exterminated rodents in the Bellock house is hardly an "unusual event" that would affect potential buyers in the same manner as would widespread rumors that the Bellock house had been inhabited by poltergeists, lepers, or murderers.[6] The inclusion of rodents in Mr. Kerwin's category of "unusual" events is tenable only insofar as it refers to situations significantly more serious than the common rodent "problem" for which exterminators are typically called.[7] The court finds plaintiffs' "devaluation of property" damage theory speculative and utterly implausible.

In its Response, plaintiffs argue that they:

> do not have to prove that they will, in fact, recover any damages for the devaluation of their home. If after discovery is completed, they are unable to find anyone other than Ms. Blair and the jury believes Orkin, the jury may very will give the Bellocks nothing for this element of damages. Nonetheless, from the facts known to the Bellocks when suit was filed, recovery of at least $50,-000 for this element of damages alone was certainly a possibility.

Response, pp. 12–13, n. 7. Plaintiffs mistake their burden here. As stated above, once this court's jurisdiction has been challenged, the party asserting jurisdiction bears the burden of supporting its jurisdictional allegations by "competent proof." Although the proponent of jurisdiction is entitled to a great deal of latitude, this latitude has limits. If the court permits the proponent of jurisdiction to support jurisdictional allegations with excessive speculation and far-fetched possibilities, the proponent's burden as well as the "competent proof" standard are rendered meaningless. The amount in controversy requirement for diversity jurisdiction would be limited only by the stretch of the attorney's imagination.

The court notes that two district court opinions from this district, both of them written by Judge Shadur, state that "the plaintiff is entitled to the benefit of any facts he could conceivably prove in support of his allegations [of jurisdiction]." *Lichter v. Paine, Webber, Jackson & Curtis, Inc.*, 570 F.Supp. 533 (N.D.Ill.1983), *citing, Farmilant v. Singapore Airlines, Ltd.* 561 F.Supp. 1148, 1151 (N.D.Ill.1983). The operative word in this holding, "conceivably," may be interpreted in a variety of ways. Plaintiffs apparently view the word broadly, as synonymous with the word "possibly." Response, p. 13, n. 6. This interpretation, however, as stated above, is inconsistent with the Seventh Circuit's "competent proof" standard. To maintain consistency with the Seventh Circuit standard, this court interprets the term more narrowly, to mean credibly, plausibly, or tenably, etc.—i.e., that which would be conceived of or contemplated by a rational and reasonable person.

Finally, as a fifth measure of damages, plaintiffs state that they are entitled to punitive damages. It is well established that: "Punitive damages are appropriate when the 'defendants acted wantonly and willfully ... or were motivated in their actions by ill will, malice, or a desire to injure the plaintiffs.' " *Tolliver v. Amici*, 800 F.2d 149, 151 (7th Cir.1986), *quoting, Hamilton v. Svatik*, 779 F.2d 383, 389 (7th Cir.1985) (citing *Jeanty v. McKey & Poa-*

---

6. The October 17, 1989 Standard & Poor's report on Orkin, which plaintiffs submit as Exhibit B to their Response, indicates that rodent and pest control problems are far from "unusual events" in this country. According to the report, Orkin has 333 branch offices in 47 states and the District of Columbia. It provides "[c]ontinuous protection against insects and rodents through periodic preventive treatments ... to homes, hotels and motels, office buildings and warehouses, food and drug stores, restaurants, food processing plants, hospitals, and aboard aircraft and ships."

7. The plaintiffs have not described the "rumor" with any more specificity than to say that neighbors believe they have a "rodent problem." Complaint, ¶ 11. The Bellocks have never claimed that the "rumor" is of a situation so atypical or shocking as to render it an "unusual event" (i.e., that the Bellock residence is infested with swarms of virulent rats).

*gue Inc.*, 496 F.2d 1119, 1121 (7th Cir. 1974)). Illinois courts "take a rather dim view of punitive damages" and require a showing of extraordinary or exceptional circumstances to justify such an award. *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir. 1990). Whether the plaintiff has made a sufficient showing to justify an award of punitive damages is an issue of law for the judge rather than the jury to decide. *Id.* (It is only after the court has determined that punitive damages are recoverable that the jury determines the amount.)

The Bellocks have raised no facts or issues which could plausibly support their punitive damage theory. They argue that:

> Orkin did not simply invade the Bellocks' right to privacy, but it did so in conjunction with the disparaging rumor about a rodent problem. Orkin knew full well that it never received authority from the Bellocks and it never attempted to verify whether the Bellocks' rodent problem had been eliminated.

Response, p. 14. Here, the plaintiffs merely reallege the conduct which gave rise to the underlying cause of action, rather than providing evidence of *additional* aggravating or malicious conduct which would justify punitive damages in addition to actual damages. "Under Illinois law, 'punitive damages should not be awarded if the defendant's misconduct is not above and beyond the conduct needed for the basis of the action.'" *Fishman v. Estate of Wirtz*, 807 F.2d 520, 560 (7th Cir.1986), *quoting, O'Brien v. State Street Bank & Trust Co.*, 82 Ill.App.3d 83, 87, 37 Ill.Dec. 263, 266, 401 N.E.2d 1356, 1359 (4th Dist.1980).[8]

The Bellocks have not met their burden of supporting their jurisdictional allegations by "competent proof." When all is said and done, the Bellocks are claiming that they are entitled to at least $50,000 because Orkin told one or perhaps several of their neighbors that they had a rodent

problem. Although plaintiffs may arguably have been wronged by Orkin and may have subjectively experienced embarrassment or even humiliation as a result, they have not established by competent proof that they are entitled to damages approaching the jurisdictional minimum of $50,000.

## CONCLUSION

Orkin's motion is granted. Plaintiffs' complaint is dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED.

telling them that the Orkin home office was closed when it was not. These incidents do not illustrate extraordinary or exceptional behavior, nor do they indicate an exacerbation of the harm suffered by the Bellocks.

---

**8.** Plaintiffs also list other allegedly aggravating circumstances: they argue that Orkin broke its promise to cancel the introductory appointments which it arranged pursuant to the offending solicitations and that Mr. Lapka, the Orkin branch manager, lied to them on one occasion,