DEXTER CORPORATION,
Plaintiff–Appellant,

v.

WHITTAKER CORPORATION,
Defendant–Appellee.

No. 90–1500.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1990.

Decided Feb. 21, 1991.

Jay A. Canel, Peter M. King, Stephen D. Davis, Canel, Davis & King, Chicago, Ill., for plaintiff-appellant.

David S. Fleming, Schaefer, Rosenwein & Fleming, Chicago, Ill., Ronald M. Greenberg, Los Angeles, Cal., for defendant-appellee.

Before POSNER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

POSNER, Circuit Judge.

This is an appeal from the dismissal, on the defendant's motion for summary judgment, of a suit for fraud and breach of contract brought by Dexter Corporation against Whittaker Corporation. The basis of federal jurisdiction is diversity of citizenship, and the parties agree that Illinois law supplies the substantive rule of decision. The case arises out of the sale by Whittaker of its "end sealant" business to Dexter; the facts, of course, must be viewed as favorably to Dexter as the record permits.

An end sealant is a chemical compound used to seal the ends of a can for beer or other foods or beverages to the can's body. The sealant is applied in liquid form during the manufacture of the can, and it dries to form a rubber-like gasket. A division of Whittaker manufactured a new type of end sealant, called a "high solids" end sealant, designed to meet the specifications of the Environmental Protection Agency by replacing polluting solvents with nonpolluting solids ("high solids" means "high in solids"). Whittaker developed two generations of high solids end sealant, the first called 7201C and the second, which was even higher in solids, 2136C.

Whittaker sold the second-generation product, 2136C, to American Can. That was when the trouble began. In September 1983, American Can advised Whittaker that one of American Can's customers was complaining about leakage from its cans. Gene Gluba, Whittaker's chief chemist for sealing compounds, determined that the leakage was due to premature aging of 2136C. He suspected that the cause of this condition was that the antioxidant in 2136C "was not doing its job." Although there had been no complaints as yet from purchasers of 7201C, the first-generation product, Gluba suspected that it too would age prematurely, because it contained the same antioxidant. He communicated his findings and concerns to Jeffrey Leyh, the sales manager of the division that manufactured sealing compounds. Within days an officer of Whittaker was on the phone to Dexter Corporation offering to sell Whittaker's end sealant business to Dexter. Dexter was engaged primarily in the manufacture of coatings for the inside of food and beverage cans. It had developed a high solids end sealant but had failed to bring it to market.

Dexter was interested, and in March 1984 negotiations began. Although Whittaker instructed its negotiators not to discuss the American Can problem with Dexter, Dexter knew of it and the matter came up in the negotiations. The reason Dexter knew about the problem was that it had coated the defective cans and at first American Can had thought Dexter might be the supplier at fault. Leyh assured Dexter's representatives that the end seal-

ant which it had sold to American Can had been totally different from anything it had sold its other customers, that that product had come out of old inventory, that it had been discontinued—and anyway that the American Can problem was a shipping problem, not a defective-product problem at all. Leyh also directed Gluba to throw away the "retains" from the American Can sale, that is, the samples that Whittaker retains of each batch of product that it makes. Leyh's misrepresentations, and his direction to Gluba to destroy the retains, are the foundation of Dexter's claim that its purchase of Whittaker's end sealant business was procured by fraud.

Before and during the contract negotiations American Can conducted a "heat age" test on all high solids end sealants, including Dexter's pathetic entry. Cans were subjected to high temperatures in the expectation that changes in the sealant brought about by the heat would predict how the sealant would stand up in ordinary use at much lower temperatures. *All* the high solids end sealants that were tested flunked, but Whittaker and Dexter agreed that this might just mean that the test was not a good one.

On July 2, 1984, the deal was closed and Dexter obtained Whittaker's sealing business for $1.8 million. In the contract of sale Whittaker promised to indemnify Dexter should Dexter become liable to its customers for defects in the inventory of end sealants that Whittaker had sold Dexter, provided Dexter complied with certain conditions similar to those in standard insurance contracts (insurance is a form of indemnity).

Gluba and other employees of Whittaker's end sealant division became employees of Dexter. Gluba told one of Dexter's sales managers that he was concerned with premature aging of 7201C. Nevertheless Dexter kept on making and selling that compound. Five months after the sale Ball Corporation complained to Dexter about premature aging of the end sealant compound—none other than 7201C—that Ball had bought from Whittaker before the sale. Ball followed up the complaint with a suit against both Whittaker and Dexter in 1986. Other complaints flowed in during 1985. All were settled without litigation; the Ball suit was settled, too. But because Dexter had never sought Whittaker's prior written consent to any of the settlements, as the district judge thought the contract required it to do as a condition precedent to obtaining indemnification, the judge dismissed Dexter's breach of contract claim. He dismissed the fraud claim also, because Dexter had failed to show reasonable reliance on the alleged misrepresentations. Dexter "had sufficient information before the closing on the contract to know that there was a premature aging problem with defendant's sealants and had the expertise to understand the implications of this information." Dexter "was aware both that there was a general problem being experienced with high solids compounds and that American Can, a major customer of defendant, specifically complained about defendant's high solids compounds and sealants. In fact, plaintiff's own high solids compound had exhibited the same problem," namely, premature aging.

■■■ In defense of the judge's dismissal of the fraud claim, Whittaker argues that Dexter knew full well that there was a serious risk that 7201C would prove defective yet it went ahead with the purchase anyway, presumably being compensated in the purchase price for the risk it was assuming. If this is true, then Dexter must lose. It would be a case in which the purchaser had placed no reliance on the seller's misrepresentations, and reliance is an essential element of a fraud case, because without reliance, fraud is harmless. *Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.,* 896 F.2d 1035, 1041 (7th Cir.1990). This may turn out to be such a case, but the question before us—since we are reviewing the grant of summary judgment for the defendant—is simply whether the issue of reliance is contestable. It is.

■■■ What exactly did Dexter know? On this record—a potentially vital qualifica-

tion, obviously—it may not even have known that the problem with the end sealant that had been sold to American Can was not a shipping problem but a product problem; for Leyh had assured Dexter that it *was* a shipping problem. Even if Dexter knew better, there is no reason to think that it also knew that the first-generation end sealant, 7201C, which had not been involved in the sale to American Can, was also defective. Dexter probably *should* have known this, in the sense that a reasonable person would have been suspicious and would have investigated further. So saying, we put to one side the premature aging of Dexter's own high solids end sealant, the results of the heat age test, and Dexter's failure to discover the defect even after complaints from customers started rolling in. Dexter's entry into the high solids end sealant market had flop written all over it from the start; the results of the heat age test, so far as the other high solids end sealants were concerned, were regarded as a commentary more on the test than on the sealants; and knowledge acquired after the contract was signed and the deal closed is irrelevant to liability although it may serve to reduce damages. The important thing is that Dexter's lawyer advised the company to look more deeply into the American Can problem before it signed the contract with Whittaker and that he was not the only one to give such advice. A more searching inquiry, presumably directed to Whittaker's technical staff, would—unless frustrated by Gluba's having discarded the retains at Leyh's direction—have revealed that the problem with 2136C was common to 7201C. Dexter was careless to assume, merely on the strength of Leyh's oral assurances (and Leyh after all was a salesman), that the problem had been isolated to 2136C.

■ So if contributory negligence were a defense to fraud, the district judge would have been right to dismiss Dexter's fraud claim. But it is not, as we had *occasion* to repeat recently in a case that is factually much like this one and, also like this one, arose under Illinois law. *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc., supra,* 896 F.2d at 1042. What is true

is that the victim of fraud must prove not only that he relied to his detriment on the fraud but that he *reasonably* relied, *id.; Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.,* 910 F.2d 1540, 1549 (7th Cir.1990); *Consolidated Bearings Co. v. Ehret–Krohn Corp.,* 913 F.2d 1224, 1229 (7th Cir.1990), and this is rather like having to prove freedom from contributory negligence. It is not the same thing, though, and in *AMPAT* we tried to explain the difference. 896 F.2d at 1042. If a buyer is not merely careless, but either knows that the seller's representations are false or, strongly suspecting that they are false, declines to investigate further because he is content to take the risk, presumably having been compensated by being given a break on the purchase price, then he cannot cry fraud. The wound is self-inflicted. Notice how in this analysis, reliance and reasonable reliance tend to merge; an ostrich can hardly be said to *rely* on there being no danger in the vicinity.

■ This may be such a case but the facts are not so clear that a trial of the issue can be avoided. Dexter had positive assurances from Leyh that whatever the problem with 2136C, the compound sold to American Can, might be—whether it was a shipping problem or a product problem— the problem did not afflict 7201C, which constituted the rest of the inventory transferred by the sale. A careful purchaser would not have been content with these assurances—the very number of them would have put a careful person on the *qui vive*—but unless we can be almost certain on this record that Dexter either knew, or strongly suspected but did not want to discover, that 7201C was defective, we cannot uphold the grant of summary judgment. The required degree of certitude is missing. That Dexter knew that premature aging was a *potential* problem with *all* high solids end sealants is not the equivalent of its knowing that it was an actual and in fact devastating problem with a particular sealant, when no customer had yet complained. There were warning signals aplenty, but a failure to heed warning

signals is not the sort of reckless indifference to the truth that establishes unreasonable reliance in the law of fraud; it is merely negligence. The dismissal of the fraud claim must be reversed.

■ So far as the contract claim is concerned, however, we are unimpressed by Dexter's main argument for reversal, which is that having induced the contract by fraud Whittaker should not be permitted to rely on the conditions in the contract that limited its liability. If Dexter proves fraud, it can obtain all its compensatory damages and more and can forget about the contract. If it fails to prove fraud, fraud drops out of the picture and Dexter is left with a pure contract claim. The contract set a perfectly reasonable condition, found in virtually all insurance and most other indemnity contracts—that the indemnitee not be permitted to settle unilaterally any claim for which it might seek indemnification. Given indemnification, the real party in interest in any settlement of claims against Dexter was not Dexter but Whittaker; only Whittaker had an incentive to resist them strongly. Whittaker therefore insisted in the contract that its prior written consent be obtained for any settlement that Dexter (really just a stakeholder) wanted to make of any claim that had not ripened into a lawsuit. This was a reasonable condition that Dexter violated without excuse in the case of the four complaints that never ripened into lawsuits.

■ The fifth complaint was that of Ball Corporation, and it did result in a suit. The indemnity provision in the contract of sale between Whittaker and Dexter contained an important exception to the requirement of prior written consent. In cases in which the customer's claim ripened into a lawsuit—and so in the Ball case— Dexter was required only to notify Whittaker of the suit and to allow Whittaker, at Whittaker's option, to take over the defense. If Whittaker declined the option, then Dexter was free to settle the suit on any terms it liked. There was in this case, it is true, no formal notification, but then no formalities of notification are prescribed by the contract, which speaks of notification *simpliciter*. As it happens, Whittaker was a codefendant of Dexter in the suit brought by Ball Corporation, and in these circumstances additional notification of the existence of a claim that Dexter might ask Whittaker to indemnify would have been superfluous. Whittaker was there, defending itself, alongside Dexter, and if it wanted to assert its contractual right to take over Dexter's defense as well it could easily have done it. So at least it appears on this record.

The dismissal of the contract claim arising out of the settlement of Ball Corporation's suit must therefore be reversed along with the dismissal of the fraud claim. We affirm the dismissal of the other contract claims. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.