**Mark MARKARIAN, Plaintiff,**

v.

**Zakar GAROOGIAN, Dr. Jack Wilkinson and Donald Alloian, Defendants.**

**No. 91 C 108.**

United States District Court, N.D. Illinois, E.D.

June 17, 1991.

Howard L. Stone, Michael L. Siegel, Carlo E. Poli and David A. McGuire, Stone, McGuire & Benjamin, Chicago, Ill., for plaintiff Mark Markarian.

Joseph F. Spitzzeri, Cole, Grasso, Fencl & Skinner, Ltd., Chicago, Ill., and Dennis L. Veraldi, and Timothy P. Ryan, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendant Donald Alloian.

## MEMORANDUM ORDER

BUA, District Judge.

Plaintiff's three-count complaint names three defendants as participants in a scheme to defraud. One of the defendants, Donald Alloian, has filed a motion to dismiss. For the reasons stated herein, Alloian's motion to dismiss is denied.

## I. FACTS

The allegations contained in plaintiff's first amended complaint, which must be taken as true for purposes of this motion to dismiss,[1] depict an unsophisticated civil conspiracy that netted an unsuspecting, wealthy philanthropist.

The philanthropist, plaintiff Mark Markarian, was first lured into the alleged fraudulent scheme by his personal airplane pilot, Gary Alloian.[2] In April 1989, Gary presented Markarian with an opportunity to invest in a remarkable invention. Gary explained that he was acquainted with two individuals, defendants Zakar Garoogian and Dr. Jack Wilkinson, who had developed a device that could generate energy through "cold fusion"—a discovery which, if valid, would revolutionize today's methods of energy production.[3]

Gary stated that he had already invested $75,000 in the invention, and that the invention could potentially earn billions of dollars. According to Gary, "Zakar [Garoogian] had just turned down a [sic] offer of $500,000,000.00 from agents of the Korean Government for the invention." *First Amended Complaint*, ¶ 10. He further indicated that "they did not want the invention to fall into foreign hands"; nor did they "want the American Government to steal the invention." *Id.* Gary informed Markarian that Garoogian wanted Markarian's help in marketing the invention.

Apparently, Markarian was enticed by Gary's proposal because in May 1989, Markarian met with Gary, Garoogian, and Wilkinson to discuss the deal. During this meeting, Garoogian and Wilkinson told Markarian that the power source was housed in a small black box that created "perpetual energy out of core electricity." *Id.* ¶ 12. To show that the invention actually worked, Garoogian conducted two small demonstrations. Garoogian and Wilkinson then allegedly told Markarian:

that they had worked on the invention for fourteen years;

that people would kill for it and people had been trying to steal it;

that helicopters flew over Zakar's house trying to steal the invention;

that they had a $500,000,000 offer from the Koreans but they did not want to accept it because they did not want to deal with foreigners;

that Gary had seen the $500,000,000 check from the Koreans;

that the whole world will change when this invention comes into use;

that Zakar is Armenian and he wanted to share the invention with an Armenian who he could trust like Markarian;

---

1. Defendant has moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim. In either case, the facts pleaded in plaintiff's complaint are accepted as true. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987) (lack of personal jurisdiction); *Corcoran v. Chicago Park Dist.*, 875 F.2d 609, 611 (7th Cir.1989) (failure to state a claim).

2. For the sake of clarity, the court will hereafter refer to Gary Alloian and his brother, Donald Alloian, by their first names.

3. For years, scientists have been studying nuclear fusion—the source of energy for the sun and the stars—to find a solution to the earth's limited fuel resources. Replicating nuclear fusion at room temperatures, labeled "cold fusion," would be a giant step toward alleviating energy shortages. Cold fusion could provide a virtually inexhaustible power source, producing energy cheaply and cleanly. The recent hysteria over cold fusion was touched off in the Spring of 1989, when two Utah chemists made the highly publicized announcement that they had created cold fusion in a tabletop experiment. *See* Begley, *The Race for Fusion*, Newsweek, May 8, 1989, at 49–54. However, all the research to date has failed to conclusively establish that cold fusion is possible, much less feasible for practical applications. If cold fusion could be harnessed for daily uses, as professed by the defendants, it would indeed be a monumental breakthrough in scientific research.

that they had read about Markarian in the newspaper and knew that he was a philanthropist and an honest man;

that the invention is worth billions of dollars;

that Wilkinson had a group of Japanese investors who were interested in investing $10,000,000;

that Zakar had connected the power source to his home and used the power source to provide all of his electrical needs, but that Zakar unhooked the power source when people began to be suspicious;

that Zakar had provided information to scientists in Utah about his power source but withheld enough to ensure that if they attempted to steal the invention, they would not be able to do so;

that Wilkinson's former wife had given him a $100,000,000 check as an offer on behalf of a group to buy the power source;

that the invention would make the combustion engine outmoded and would revolutionize the world; and

that one of the power source boxes could provide energy for an entire city.

*Id.* ¶ 14. After making these incredible representations, Garoogian and Wilkinson offered to sell the invention to Markarian for $10,000,000.

Subsequent to this meeting, Gary made several telephone calls to Markarian to persuade him to buy the invention. But Markarian was not interested in investing. At that point, Gary's brother, Donald, came into the picture. Donald called Markarian to apologize for the high pressure sales tactics used by Gary. Donald and Gary later met with Markarian to assure him that they had personally invested in the invention and that it was worth billions.

Markarian's interest in the invention began to grow. In late May or early June of 1989, Markarian met with Garoogian in Illinois (at Markarian's home) and in California (at Garoogian's home). Markarian alleges that he entered into an oral contract with Garoogian at these meetings. Under the terms of the contract, Markarian would initially pay $1,650,000 to Garoogian and

Wilkinson. Upon payment, Garoogian would conclusively demonstrate that the invention performed as represented. Markarian would then raise an additional $8,350,000 from investors, at which point Garoogian would disclose to Markarian the design and processes for making the invention. Ultimately, "Markarian would receive ten percent of the first $1,000,000,000 in royalties and other profits made by the invention and . . . one hundred percent of all royalties and profits thereafter would be divided among Markarian and all other investors." *Id.* ¶ 21.

On June 7, 1989, Markarian tendered four cashier's checks to Garoogian. These checks, which totaled $1,650,000, were made payable to Garoogian and Wilkinson. On June 12, 1989, Garoogian and Gary went to Markarian's home in Illinois for purposes of conducting a demonstration of the invention. Also present at this meeting was Markarian's attorney, a patent attorney, and a scientist from Argonne National Laboratory.

The invention did not perform to Markarian's satisfaction. Consequently, he arranged for Garoogian to meet with a retired engineer to put the invention to another test. Garoogian, however, refused to participate in this controlled experiment.

When Garoogian backed down on his part of the bargain, Markarian demanded repayment. Markarian's efforts to recover his money failed, prompting him to initiate legal proceedings. On January 8, 1991, Markarian filed this diversity action against Garoogian, Wilkinson, and Donald, seeking to recover $1,650,000 plus interest for actual damages, $10,000,000 in punitive damages, and an undisclosed sum for consequential damages. Markarian's complaint contains three counts: common law fraud (Count I); breach of contract (Count II); and unjust enrichment (Count III). Donald, who is named as a defendant only in Count I, seeks to be dismissed from this lawsuit.

## II. DISCUSSION

Donald proffers two grounds for dismissal. The first ground is lack of personal

jurisdiction. Alternatively, Donald asserts that the allegations in the complaint are insufficient to state a claim for fraud.

### A. Lack of Personal Jurisdiction

■ In this case, as with any diversity case, the court has *in personam* jurisdiction over Donald (a nonresident defendant) only if an Illinois state court could exercise personal jurisdiction over him. *FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 (7th Cir. 1990). Illinois courts may exercise jurisdiction over a nonresident defendant if: 1) jurisdiction is proper under the provisions of the Illinois long-arm statute, Ill.Rev. Stat. ch. 110, para. 2–209; and 2) the exercise of jurisdiction is consistent with constitutional due process. *FMC*, 892 F.2d at 1310.[4]

To establish jurisdiction under the long-arm statute, the plaintiff must demonstrate that the defendant committed one of acts enumerated in the statute, and that the cause of action arose from the particular act. Ill.Rev.Stat. ch. 110, para. 2–209. From the allegations set forth in the complaint, it does not appear that Donald ever committed one of the jurisdictional acts in Illinois. Nonetheless, Markarian argues that one of Donald's co-conspirators committed jurisdictional acts in Illinois and that these acts may be imputed to Donald for purposes of satisfying the jurisdictional test.

■ Before reaching the question of whether the conduct of a co-conspirator may be attributed to Donald, the court must first determine whether a co-conspirator committed a jurisdictional act in Illinois. Markarian alleges that Garoogian, a co-conspirator, committed tortious acts in Illinois, sufficient to confer jurisdiction under § 2–209(a)(2). In determining where a tortious act occurred for purposes of § 2–209,

Illinois courts look to "the place where the last event necessary to hold the actor liable takes place." *Arthur Young & Co. v. Bremer*, 197 Ill.App.3d 30, 36, 143 Ill.Dec. 736, 741, 554 N.E.2d 671, 676 (1990) (citing *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961)). This is usually the place of injury. *Club Assistance Program, Inc. v. Zukerman*, 594 F.Supp. 341, 346 (N.D.Ill 1984). But when, as in this case, the plaintiff's injury is economic in nature, the plaintiff must not only show that the injury occurred here, but also that the defendant performed some acts in Illinois "indicating an intent to affect Illinois interests." *Arthur Young*, 197 Ill.App.3d at 36, 143 Ill. Dec. at 741, 554 N.E.2d at 676 (citing *Club Assistance Program*, 594 F.Supp. 341).

■ Markarian has alleged that the injury occurred here. Since he suffered an economic loss, the place of injury is Illinois, his place of residence. *See Club Assistance Program*, 594 F.Supp. at 346. Markarian has also shown that a co-conspirator committed acts in Illinois with the intent to affect Illinois interests. The complaint alleges that Garoogian came to Markarian's home in Illinois in late May or early June 1989, and induced Markarian to enter into an oral contract based on numerous fraudulent misrepresentations. On June 12, 1989, Garoogian returned to Illinois to demonstrate that the invention performed as represented. After conducting a misleading demonstration, Garoogian again made several misrepresentations to Markarian. At a third meeting in Illinois, when Markarian arranged for Garoogian to meet with an engineer, Garoogian made additional misrepresentations.

The combined weight of these acts leaves no doubt that Garoogian intended to affect Illinois interests. Clearly, Garoogian in-

---

4. The Illinois long-arm statute has been amended to extend the reach of jurisdiction as far as due process allows. *See* Ill.Rev.Stat. ch. 110, para. 2–209(c) (1989) ("[a] court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States"). Markarian claims that the amendment has done away with the need to undertake the two-part jurisdic-

tional analysis. Regardless of Markarian's interpretation of the amendment, the amendment is inapplicable to this case because the acts by which Donald allegedly submitted to this court's jurisdiction occurred prior to September 7, 1989 —the effective date of the amendment. *See Bankers Leasing Ass'n v. Tompkins, McGuire & Wachenfeld*, 734 F.Supp. 309 (N.D.Ill.1990).

tended to communicate his message to Illinois. His meetings with Markarian were not merely fortuitous. Garoogian made the fraudulent misrepresentations in furtherance of a scheme to defraud an Illinois resident and, therefore, he intended to affect Illinois interests. The acts committed by Garoogian in Illinois, coupled with an economic injury in Illinois, lead to the inescapable conclusion that tortious acts were committed in Illinois within the meaning of § 2–209(a)(2). Since Markarian's fraud claim arises from these tortious acts, they provide the basis for establishing personal jurisdiction.

■ Having determined that one of Donald's co-conspirators committed tortious acts in Illinois, the next question is whether these acts may be attributed to Donald. The conspiracy theory of jurisdiction is not firmly rooted in Illinois jurisprudence. Markarian has not cited a single case in which the Illinois Supreme Court applied the conspiracy theory. Although the supreme court has not rejected the viability of such a theory in all circumstances, it has recognized that the invocation of jurisdiction based on acts of co-conspirators is subject to question. *See Green v. Advance Ross Elecs. Corp.*, 86 Ill.2d 431, 441, 56 Ill.Dec. 657, 662, 427 N.E.2d 1203, 1208 (1981) (citing *Chromium Indus., Inc. v. Mirror Polishing & Plating Co.*, 448 F.Supp. 544, 552 (N.D.Ill.1978)). At any rate, the Seventh Circuit has concluded that the conspiracy theory of jurisdiction is viable in Illinois. *Davis v. A & J Elecs.*, 792 F.2d 74, 76 (7th Cir.1986); *Textor v. Board of Regents*, 711 F.2d 1387, 1392–93 (7th Cir.1983). A defendant can be subject to the jurisdiction of an Illinois court under the conspiracy theory if: 1) the defendant was part of an actionable conspiracy; and 2) a co-conspirator performed a substantial act in furtherance of the conspiracy in Illinois. *Textor*, 711 F.2d at 1393.

Markarian easily satisfies this test. The complaint alleges an actionable conspiracy, of which Donald is a participant. The complaint paints a picture of a conscious plan on the part of defendants to engage Markarian's interest in the allegedly phony invention. The complaint describes how the conspirators each played a part in persuading Markarian that the invention was extremely valuable.

Markarian's fraud claim is premised on defendants' concerted efforts to procure his investment in the invention. The very first allegation under Count I puts Donald on notice as to the conspiracy theory: "From in or about April, 1989, through in or about June 1, 1990, defendants entered into a conspiracy to defraud the plaintiff of $1,650,000.00 by engaging in the following overt acts." *First Amended Complaint*, ¶ 8. Markarian then proceeds to enumerate acts committed in furtherance of the alleged conspiracy. As stated above, Garoogian committed numerous acts within Illinois, all to promote the conspirators' common objective.

Markarian's allegations support the conclusion that the defendants shared the same conspiratorial motive and objective, and carried out substantial acts in Illinois in furtherance of that objective. These acts, which certainly would confer jurisdiction over Donald if committed by him personally, are no less relevant to the establishment of jurisdiction when committed by one of his co-conspirators.

■ Donald makes the argument that Garoogian's acts cannot be attributed to him in the absence of any allegations that Garoogian was acting as his agent. True enough, "the theory of jurisdiction based on the acts of a co-conspirator must be that co-conspirators are each others' agents." *Green*, 86 Ill.2d at 440–41, 56 Ill.Dec. at 662, 427 N.E.2d at 1208. Markarian's allegations, however, are not defective merely because he does not specifically use the term "agent." It is enough that the allegations show a factual connection between Donald and Garoogian's activity in Illinois. An act in furtherance of the conspiracy, as required by the Seventh Circuit in *Textor*, will establish such a connection. In a conspiracy, each participant is authorized by the others to commit acts in furtherance of the conspiracy. *See Rutledge v. Electric Hose & Rubber Co.*, 327 F.Supp. 1267, 1274 (C.D.Cal.1971), *aff'd*, 511 F.2d 668 (9th Cir. 1975). By alleging that Donald and Garoo-

gian were members of the same conspiracy, and that Garoogian committed tortious acts within Illinois in furtherance of the conspiracy, Markarian has properly availed himself of the conspiracy theory of personal jurisdiction.[5] Accordingly, the tortious acts committed by Garoogian in Illinois subject Donald to jurisdiction under the Illinois long-arm statute.

■ Although Markarian has demonstrated that jurisdiction is proper under the long-arm statute, the inquiry does not end there. Markarian must also show that the exercise of jurisdiction would not violate due process. This issue does not detain the court long. Donald purposefully directed his tortious activity toward Illinois. Since he participated in a deliberate plan to defraud an Illinois resident, "he should reasonably anticipate being haled into court" in Illinois. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *see also Club Assistance Program*, 594 F.Supp. at 348. Maintaining this lawsuit will not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)).

Based on the allegations set forth in the first amended complaint, the court concludes that Markarian has provided sufficient facts to make a prima facie showing of personal jurisdiction over Donald.

### B. Failure to State a Claim

■ As an alternative basis for dismissal, Donald argues that Markarian has failed to state a claim.

To state a claim for fraud under Illinois law, the plaintiff must establish:

> (1) that the defendant made false statements of material fact, and not of opinion; (2) knowing that they were false; (3) intending that the plaintiff rely on them; (4) that plaintiff did rely; (5) that this reliance was justified; and (6) that the plaintiff was damaged thereby.

*West v. Western Casualty and Sur. Co.*, 846 F.2d 387, 393 (7th Cir.1988). Donald argues that Markarian cannot satisfy two of these elements. Donald submits that he never made a misrepresentation of material fact and, even if he did, Markarian was not justified in relying on the statement.

The only misrepresentation that Markarian attributes directly to Donald is the statement that he had personally invested his own money in the invention and that the invention was worth billions of dollars. Donald asserts that any statement he made as to the value of the invention was not a misrepresentation of material fact, but rather a mere expression of opinion.[6] Generally, expressions of opinion (such as predictions as to future business performance or profitability) are not actionable as fraudulent misrepresentations. *Id.; Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 n. 1 (7th Cir.1985); *North Am. Fin. Group, Ltd. v. S.M.R. Enters., Inc.*, 583 F.Supp. 691, 698 (N.D.Ill.1984). This general rule must be applied circumspectly. Whether a statement is considered fact or nonactionable opinion depends on the context in which it is made. *West*, 846 F.2d at 393.

On the surface, Donald's statement that the invention is worth billions appears to be

---

5. In connection with his motion to dismiss for lack of personal jurisdiction, Donald has submitted an affidavit (as he is permitted to do, *Turnock*, 816 F.2d at 333), stating that Garoogian was not his agent. In response, Markarian has submitted his own affidavit, which reaffirms that Garoogian was part of the conspiracy and that he committed acts in furtherance of the conspiracy. Conflicts in the affidavits are to be resolved in favor of the plaintiff, Markarian. *Id.* In light of this dispute, Donald's self-serving statement is not sufficient to justify dismissal from this lawsuit—especially since "the existence and scope of an agency relationship are

questions of fact, to be decided by the trier of fact." *St. Ann's Home for the Aged v. Daniels*, 95 Ill.App.3d 576, 579, 51 Ill.Dec. 64, 67, 420 N.E.2d 478, 481 (1981).

6. Donald does not even address significance of the first aspect of the statement—*i.e.*, that he had personally invested in the invention. This statement, if untrue, could certainly be considered a material misrepresentation that Markarian may have reasonably relied upon when determining whether to invest his own money.

one of future performance (and thus opinion). Considering the surrounding circumstances, however, that statement cannot be characterized as a prediction or mere "puffing." If Markarian's allegations are true, Donald had knowledge that the invention could never make billions of dollars; he knew that the invention was actually worthless. Donald did not hold a genuine belief that the invention could perform as represented. There was no reasonable basis for his so-called opinion. The statement made by Donald presupposes that the invention is viable and, in that sense, it is wholly misleading. Under the circumstances of this case, Donald's statement is tantamount to a "factual" misrepresentation.

Even if, as Donald alleges, the statement is one of opinion, Donald cannot escape responsibility for Markarian's injury. As a participant in an actionable civil conspiracy, Donald is liable not only for his own actions, but for the actions of his co-conspirators as well. *Old Sec. Life Ins. Co. v. Continental Ill. Nat'l Bank and Trust Co.*, 740 F.2d 1384, 1397 (7th Cir.1984); *Prudential Ins. Co. v. Curt Bullock Builders, Inc.*, 626 F.Supp. 159, 163 (N.D. Ill.1985). Donald's co-conspirators made numerous fraudulent misrepresentations to Markarian. These misrepresentations, made in furtherance of the conspiracy, are attributable to Donald for purposes of Markarian's fraud claim.

■ Donald nonetheless argues that Markarian could not have justifiably relied on any of the misrepresentations that were made. Reliance is not justified when the fraud victim has notice of the fraud. *AM-PAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041 (7th Cir.1990). In other words, if the victim deliberately or recklessly accepted a risk, he may not recover for fraud. *Id.* at 1041–42. Deliberate behavior denotes conduct taken in the face of a known risk. *Id.* at 1042. An individual will be said to have acted recklessly, on the other hand, if he ignored an obvious risk—"even if he does not himself perceive the risk." *Id.*

■ The complaint indicates that Markarian did not act deliberately and, at this stage of the litigation, Markarian's allegations are considered true. Acknowledging that Markarian did not have actual notice of the alleged fraud, Donald argues that Markarian was reckless in failing to discover any foul play. Although Donald admits that his co-conspirators made blatant misrepresentations, he contends that the statements were so "incredible" that no reasonable person would have believed them.

Such a conclusion is better left to the jury. The court cannot say, as a matter of law, that Markarian acted unreasonably in relying upon the misrepresentations of the conspirators. While many of the representations made by defendants may seem fantastic when taken out of context, it must be remembered that this business enterprise was presented to Markarian at a time when cold fusion was generating a great deal of media attention. Very few individuals, including Markarian, are versed in the science of nuclear fusion and the vagaries of physics. Despite Markarian's attempts to verify the authenticity of the invention, Garoogian continued to deceive him by conducting misleading demonstrations. Considering the underlying circumstances of this case, combined with the high pressure sales tactics employed by defendants, a trier of fact could very well find that Markarian justifiably relied on the alleged misrepresentations. Markarian's allegations of fraud are sufficient to withstand Donald's motion to dismiss.

## III. CONCLUSION

For the foregoing reasons, defendant Donald Alloian's motion to dismiss is denied.

IT IS SO ORDERED.